RCH/LZ:RWN/SMS/BET
F. #2025R00028

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

- against -

Docket No. 25-CR-182 (S-1) (RPK)

KIMBERLY OSORIO,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

THE GOVERNMENT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTIONS *IN LIMINE*

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Russell Noble
Sean M. Sherman
Brooke E. Theodora
Assistant U.S. Attorneys
(Of Counsel)

TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

FACTUAL BACKGROUND ..... 2

ARGUMENT ..... 11

I. Limited Evidence Demonstrating the Existence of an Investigation into the Underlying Scheme is Admissible ..... 11

A. Applicable Law ..... 12

B. Discussion ..... 13

II. Evidence of the Defendant's Full Course of Obstructive Conduct Should be Admitted ..... 15

III. The Court Should Preclude the Defendant from Re-Litigating Legal Issues Determined by the Court in the Motion to Suppress ..... 17

IV. The Court Should Permit the Government to Introduce the Defendant's Inculpatory Statements from a Video Recording and Preclude the Defendant from Introducing Her Own Self-Serving Statements ..... 19

V. The Defendant's Inculpatory Communications with Co-Conspirators Are Admissible if Offered by the Government ..... 23

VI. The Court Should Preclude Evidence and Argument Regarding Whether the Defendant's Co-Conspirators Have Been Charged or Convicted for Obstructive Conduct ..... 29

VII. The Court Should Permit the Government to Authenticate Certain Records by Certification ..... 33

VIII. The Defendant Should Be Precluded from Impeaching Witnesses with Agent-Prepared Interview Reports ..... 36

A. Legal Standard ..... 36

B. Discussion ..... 37

IX. The Court Should Preclude Evidence and Argument Concerning Possible Punishment and Collateral Consequences ..... 38

X. The Defendant Should Be Precluded from Introducing Evidence Regarding Her Lack of Criminal History ..... 40

XI. The Defendant Should Be Ordered to Disclose Rule 16(b) Discovery and Trial Exhibits to Be Introduced During the Government's Case ..... 41

CONCLUSION ..... 44

# TABLE OF AUTHORITIES

Page(s)

## CASES

Crane v. Kentucky,
476 U.S. 683 (1986) .... 18
Davis v. Alaska,
415 U.S. 308 (1974) .... 39
Davis v. Washington,
547 U.S. 813 (2006) .... 26
Fischer v. United States,
603 U.S. 480 (2024) .... 12
Giglio v. United States,
405 U.S. 150 (1972) .... 26
Melendez-Diaz v. Massachusetts,
557 U.S. 305 (2009) .... 34
Palermo v. United States,
360 U.S. 343 (1959) .... 37
Shannon v. United States,
512 U.S. 573 (1994) .... 38
United States v. Abouhalima,
201 F.3d 432 (2d Cir. 1999) .... 24
United States v. Adekanbi,
675 F.3d 178 (2d Cir. 2012) .... 31
United States v. Aiyaswamy,
No. 15-CR-568 (LHK), 2017 WL 1365228 (N.D. Cal. Apr. 14, 2017) .... 43
United States v. Almonte,
956 F.2d 27 (2d Cir. 1992) .... 36, 37
United States v. Anderson,
563 F. Supp. 3d. 691 (E.D. Mich. Sept. 27, 2021) .... 34
United States v. Barone,
913 F.2d 46 (2d Cir. 1990) .... 20
United States v. Battaglia,
No. 05-CR-774 (KMW), 2008 WL 144826 (S.D.N.Y. Jan. 15, 2008) .... 40
United States v. Black,
No. 13-CR-316 (DLI), 2014 WL 5783067 (E.D.N.Y. Nov. 5, 2014) .... 22
United States v. Blake,
195 F. Supp. 3d 605 (S.D.N.Y. 2016) .... 21
United States v. Blume,
967 F.2d 45 (2d Cir. 1992) .... 39
United States v. Bout,
651 Fed. App'x 62 (2d Cir. 2016) .... 33
United States v. Boyle,
No. 08-CR-523 (CM), 2009 WL 5178525 (S.D.N.Y. Dec. 23, 2009) .... 30

United States v. Brand,
467 F.3d 179 (2d Cir. 2006), abrogated on other grounds by United States v. Cabrera, 13 F.4th 140 (2d Cir. 2021) ........ 23
United States v. Cambindo Valencia,
609 F.2d 603 (2d Cir. 1979) ........ 24
United States v. Capaldo,
402 F.2d 821 (2d Cir. 1968) ........ 21
United States v. Carboni,
204 F.3d 39 (2d Cir. 2000) ........ 16
United States v. Carneglia,
No. 08-CR-76 (JBW), 2009 WL 185725 (E.D.N.Y. Jan. 27, 2009) ........ 30, 32
United States v. Casamento,
887 F.2d 1141 (2d Cir. 1989) ........ 25
United States v. Chen,
No. 22-CR-158 (ENV) (E.D.N.Y. Oct. 17, 2024) ........ 42, 43
United States v. Coplan,
703 F.3d 46 (2d Cir. 2012) ........ 13, 21
United States v. DiMarzo,
80 F.3d 656 (1st Cir. 1996) ........ 39
United States v. Dunnican,
961 F.3d 859 (6th Cir. 2020) ........ 34
United States v. Edwards,
631 F.2d 1049 (2d Cir. 1980) ........ 19, 38
United States v. Ellis,
460 F.3d 920 (7th Cir. 2006) ........ 35
United States v. Failing,
553 F. App'x 71 (2d Cir. 2014) ........ 26
United States v. Farhane,
634 F.3d 127 (2d Cir. 2011) ........ 26
United States v. Gagliardi,
506 F.3d 140 (2d Cir. 2007) ........ 33
United States v. Gigante,
166 F.3d 75 (2d Cir. 1999) ........ 24, 25
United States v. Gonzalez,
110 F.3d 936 (2d Cir. 1997) ........ 16
United States v. Gonzalez,
399 F. App'x 641 (2d Cir. 2016) ........ 22
United States v. Gupta,
747 F.3d 111 (2d Cir. 2014) ........ 24, 25
United States v. Guzman Loera,
No. 09-CR-466 (BMC) (E.D.N.Y.) ........ 38
United States v. Harrell,
No. 20-CR-239 (BMC) (E.D.N.Y.) ........ 38
United States v. Harris,
491 F.3d 440 (D.C. Cir. 2007) ........ 41

United States v. Hill,
658 F. App'x 600 (2d Cir. 2016) .......... 22, 32
United States v. Hill,
No. 12-CR-214, 2014 WL 198813 (E.D.N.Y. Jan. 14, 2014) .......... 32
United States v. Holden,
No. 13-CR-444, 2015 WL 1514569 (D. Or. Mar. 19, 2015) .......... 42
United States v. Hsia,
No. 98-CR-0057 (PLF), 2000 WL 195067 (D.D.C. Jan. 21, 2000) .......... 41
United States v. Huntress,
No. 13-CV-199S, 2015 WL 631976 (W.D.N.Y. Feb. 13, 2015) .......... 43
United States v. Inniss,
No. 18-CR-134 (KAM), 2019 WL 6999912 (E.D.N.Y. Dec. 20, 2019) .......... 29, 31
United States v. Jackson,
180 F.3d 55 (2d Cir. 1999) .......... 22
United States v. Jackson,
345 F.3d 59 (2d Cir. 2003) .......... 26
United States v. Johnson,
469 F. Supp. 3d 193 (S.D.N.Y. 2019) .......... 25, 27
United States v. Johnson,
507 F.3d 793 (2d Cir. 2007) .......... 22
United States v. Johnson,
688 F.3d 494 (8th Cir. 2012) .......... 35
United States v. Komasa,
767 F.3d 151 (2d Cir. 2014) .......... 33
United States v. Kopp,
562 F.3d 141 (2d Cir. 2009) .......... 21, 22
United States v. Lange,
834 F.3d 58 (2d Cir. 2016) .......... 22
United States v. Larkin,
No. 2:12-CR-319 (GWF), 2015 WL 4415506 (D. Nev. July 20, 2015) .......... 42
United States v. Lewis,
110 F.3d 417 (7th Cir. 1997) .......... 39
United States v. Lights,
No. 15 CR 721 (RWS), 2016 WL 7098633 (S.D.N.Y. Dec. 5, 2016) .......... 17
United States v. Logan,
419 F.3d 172 (2d Cir. 2005) .......... 26
United States v. Maldonado-Rivera,
922 F.2d 934 (2d Cir. 1990) .......... 25, 27
United States v. Marin,
669 F.2d 73 (2d Cir. 1982) .......... 20, 21
United States v. McGee,
564 F.3d 136 (2d Cir.2009) .......... 16
United States v. Miller,
641 F. Supp. 2d 161 (E.D.N.Y. 2009) .......... 40
United States v. Morgan,
505 F.3d 332 (5th Cir. 2007) .......... 35

United States v. Napout,
No. 15-CR-252 (PKC), 2017 WL 6375729 (E.D.N.Y. Dec. 12, 2017) .................................. 42
United States v. Nersesian,
824 F.2d 1294 (2d Cir.1987) ...................................................................................... 16
United States v. Paccione,
949 F.2d 1183 (2d Cir. 1991) ..................................................................................... 40
United States v. Padilla,
203 F.3d 156 (2d Cir. 2000) ................................................................................. 25, 27
United States v. Paulino,
445 F.3d 211 (2d Cir. 2006) ...................................................................................... 20
United States v. Perez,
No. 05-CR-441 (PKL), 2005 WL 2709160 (S.D.N.Y. Oct. 20, 2005) .................................. 20
United States v. Qualls,
613 F. App'x 25 (2d Cir. 2015) ................................................................................... 34
United States v. Ramsey,
No. 21-CR-495 (ARR), 2023 WL 2523193 (E.D.N.Y. Mar. 15, 2023) .................................. 18
United States v. Reynaldo Neseosupe,
No. 19-CR-424 (FB) (E.D.N.Y.) ..................................................................................... 18
United States v. Rosario,
No. 22-CR-355 (ENV) (Feb. 10, 2025) ............................................................................ 13
United States v. Saneaux,
365 F. Supp. 2d 493 (S.D.N.Y. 2005) ...................................................................... 24, 27
United States v. Servider,
No. 15-CR-174 (ENV) (May 10, 2018) ............................................................................ 13
United States v. Rankin,
No. 23-CR-24 (MKB) (E.D.N.Y.) .................................................................................... 18
United States v. Shulman,
624 F.2d 384 (2d Cir. 1980) ...................................................................................... 28
United States v. Slaughter,
386 F. 3d 401 (2d Cir. 2004) ...................................................................................... 13
United States v. Smothers,
652 F. Supp. 3d 271 (E.D.N.Y. 2023) ..................................................................... 23, 42
United States v. Swenson,
298 F.R.D. 474 (D. Idaho 2014) .............................................................................. 42, 43
United States v. Thomas,
116 F.3d 606 (2d Cir. 1997) ...................................................................................... 39
United States v. Tin Yat Chin,
371 F.3d 31 (2d Cir. 2004) ........................................................................................ 33
United States v. Walsh,
7 F. App'x 20 (2d Cir. 2001) ...................................................................................... 13
United States v. Warren,
No. 22-CR-231 (DLI) (Sept. 6, 2023) ............................................................................ 42
United States v. Watts,
934 F. Supp. 2d 451 (E.D.N.Y. 2013) ................................................................. 30, 31, 39
United States v. Weiland,
420 F.3d 1062 (9th Cir. 2005) .................................................................................... 35

United States v. White,
545 F. App’x 69 (2d Cir. 2013) ... 32
United States v. White,
692 F.3d 235 (2d Cir. 2012) ... 30
United States v. Williams,
930 F.3d 44 (2d. Cir. 2019) ... 23
United States v. Yeley-Davis,
632 F.3d 673 (10th Cir. 2011) ... 35

RULES

Fed. R. Crim. P. 16(b)(1)(A) ... 41
Fed. R. Crim. P. 26.2 ... 43
Fed. R. Evid. 104(a) ... 17
Fed. R. Evid. 401 ... 19, 29, 30
Fed. R. Evid. 402 ... 19, 29
Fed. R. Evid. 403 ... 19, 30, 38
Fed. R. Evid. 613(b) ... 36
Fed. R. Evid. 803(6) ... 33, 35
Fed. R. Evid. 902(14) ... 33
Fed. R. of Evid. 801(c) ... 20
Fed.R.Evid. 901(a) ... 33
Federal Rules of Evidence 902(11) ... 33, 35
Federal Rules of Evidence 902(13) ... 33

PRELIMINARY STATEMENT

The defendant is charged with concealment of evidence, in violation of Title 18, United States Code, Section 1519 (Count Seven); obstruction of justice, in violation of Title 18, United States Code, Section 1512(c)(2) (Count Eight); and two counts of making false statements in violation of Title 18, United States Code, Section 1001(a)(2) (Counts Nine and Ten). See Superseding Indictment, ECF No. 31. The evidence will show that the defendant hid her co-defendant Rashad Ruhani's cellular telephone from law enforcement agents and then repeatedly lied about it to law enforcement.

In advance of trial, which is scheduled to begin on June 1, 2026, the government submits this memorandum of law in support of its motions in limine[1]: (1) to admit relevant evidence showing the background of the investigation; (2) to admit relevant evidence of the defendant's full course of obstructive conduct; (3) to preclude the defendant from re-litigating issues related to her suppression motion adjudicated by the Court; (4) to admit certain statements by the defendant on a video recording and exclude the rest of the recording; (5) to admit communications between the defendant and her co-conspirators; (6) to preclude argument about whether other individuals have been charged or convicted; (7) to authenticate certain records by certification; (8) to preclude the defense from impeaching witnesses with agent-generated interview reports; (9) to preclude evidence or argument about the consequences of a conviction;

[1] This memorandum cannot anticipate every type of evidence and testimony that will be offered at trial and does not detail all the specific testimony the government will elicit at trial. The government respectfully reserves its right to supplement this filing with additional papers setting forth legal authority for the introduction of evidence and/or additional motions in limine as legal issues are identified closer to trial, including as the government interviews potential witnesses, or in response to any objection by the defense to the introduction of evidence. The government will meet and confer with defense counsel to attempt to resolve any issues as they arise prior to engaging in motion practice.

and (10) to preclude evidence or argument about the defendant's lack of a criminal record. Finally, the government also moves the Court to order the defendant to disclose Rule 16(b) materials and trial exhibits and to preclude the defendant from using at trial any materials that have not been disclosed to the government by May 25, 2026.

For the reasons set forth below, the government's motions in limine should be granted.

## FACTUAL BACKGROUND

### I. Background to the Offense Conduct

On June 2, 2025, a grand jury sitting in the Eastern District of New York returned a sealed indictment charging Rashad Ruhani and Lori Zeno (the defendant's future co-defendants) with wire fraud conspiracy, in violation of 18 U.S.C. § 1349; wire fraud, in violation of 18 U.S.C. § 1343; theft concerning programs receiving federal funds, in violation of 18 U.S.C. § 666; and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (collectively, the "Charged Offenses"). See United States v. Zeno, et al., 25-CR-182 (RPK), ECF No. 1. The Charged Offenses arose out of an investigation by the Federal Bureau of Investigation ("FBI") into Ruhani's and Zeno's scheme to defraud a non-profit organization with which they were associated, the Organization (the "Organization"), and embezzle tens of thousands of dollars from the Organization. Among other things, in the indictment, Ruhani was charged with using the Organization's funds to pay for rent at a luxury penthouse apartment in which Ruhani resided (the

"Penthouse"). See id. ¶¶ 7–8. On the same day that the grand jury returned an indictment, the Court authorized sealed arrest warrants for Ruhani and Zeno.[2]

On June 2, 2025, United States Magistrate Judge Cheryl L. Pollak authorized a warrant to search, among other things, the Penthouse, the person of Ruhani, as well as other subjects of the investigation (the "Subjects"), and seize electronic devices in the Subjects' possession, custody, or control as evidence and instrumentalities of the Charged Offenses (collectively, the "Device Warrants"). On June 3, 2025, Magistrate Judge Pollak authorized warrants to search for active location information for two cellular telephones associated with Ruhani (one ending in x8104 and another ending in x4077), as well as cellular telephones associated with Zeno and the Subjects (collectively, the "CSLI Warrants").

II. The Offense Conduct

In or around April 2025, the defendant and Rashad Ruhani began a romantic relationship. Between April and June, they communicated by telephone over 100 times. According to the defendant's statements to law enforcement, she was in a romantic relationship with the defendant for a couple of months prior to June 2025.

On or about June 6, 2025, the defendant and Ruhani traveled together on the same reservation from John F. Kennedy International Airport ("JFK Airport") in Queens, New York, to Los Angeles International Airport ("LAX") in California. Location information from the CSLI Warrants showed that a device associated with Ruhani ending in x8104 (the "Ruhani Device") was in the vicinity of Los Angeles between June 6, 2025, and June 10, 2025.

On or about June 10, 2025, the defendant and Ruhani returned together on a JetBlue flight from LAX to JFK Airport (the "Subject Flight"). The Subject Flight departed from LAX at

[2] Both Zeno and Ruhani have pleaded guilty to the charged scheme.

approximately 5:53 p.m. EDT and was scheduled to arrive at JFK Airport at approximately 11:30 p.m. EDT. Location information from the CSLI Warrants showed that the Ruhani Device was in the vicinity of LAX immediately prior to the Subject Flight's departure. Law enforcement agents at LAX observed the defendant and Ruhani sitting together prior to the departure of the Subject Flight and observed Ruhani holding a cellular telephone.

After the Subject Flight departed from LAX, law enforcement officers executed the Device Warrants and searched several of the Subjects in order to seize electronic devices in their possession, custody, and control. One of the Subjects from whom a device was seized was Individual-1, a known associate of Ruhani. At approximately 6:19 p.m., after Individual-1's device was seized by law enforcement officers and while the Subject Flight was en route to JFK Airport, Ruhani, using JetBlue's in-flight wi-fi connection, received a phone call on the Ruhani Device from Individual-1.[3] The two had a phone call for approximately one minute. Subsequently, at approximately 7:09 p.m., the Ruhani Device called a cellular telephone associated with another one of the Subjects from whom a device was seized ("Individual-2"), and the two had a phone call for approximately five minutes and 22 seconds.

While Ruhani was speaking with Individual-2, the defendant—through her cellular telephone ending in x1273 ("Osorio Phone-1")—began a text message conversation with a person saved in her phone as "Sonny."[4] The defendant said that she would "pass him the phone," indicating that some of the subsequent text messages from Osorio Phone-1 were sent by Ruhani.

[3] Individual-1 appears to have used a different device from the device seized by law enforcement officers pursuant to the Device Warrants. The government's investigation has revealed that this device is also associated with Individual-1.

[4] The investigation has identified "Sonny" as an individual who is related to Ruhani, was hired by the Organization in approximately November 2024, and was fired around the same time as Ruhani.

During that text message exchange, "Sonny" told the defendant and Ruhani that law enforcement agents would likely be waiting for them at JFK: "They prolly gon be there waiting for u when u land[.]" "Sonny" also advised the defendant and Ruhani to leave the Subject Flight alone and remove Ruhani's jewelry: "Walk off plane by yourself" and "take all jewelry off anything u can use as collateral[.]" The defendant also provided "Sonny" with a cellular telephone number for another phone, which was neither one of the phones included in the CSLI Warrants nor Osorio Phone-1: "my backup [phone number ending x5197]" (hereinafter, "Osorio Phone-2"). "Sonny" also told the defendant and Ruhani, in substance, that law enforcement had executed a search warrant at the Penthouse—the same apartment for which Ruhani had received reimbursement from the Organization as part of his fraud scheme.

While the Subject Flight was still in mid-air, the Osorio Phone-1 was used to conduct Internet searches for terms including "wire fraud," "federal fund misappropriation," and "rashad ruhani [the name of the Organization.]" As a result of the Internet search for "rashad ruhani [the Organization,]" Osorio Phone-1 navigated to a news article describing Zeno's suspension and Ruhani's termination from the Organization, which alluded to an ongoing investigation. Specifically, the article noted that in an email sent to the Organization's staff related to Zeno's termination, the Chair of the Board of Directors told the staff that complaints should be directed to "the New York attorney general's whistleblower office, which fields information from insiders 'with sensitive information about misdeeds by their employer.'" In addition, after "Sonny" told the defendant and Ruhani that law enforcement had searched the Penthouse, Osorio Phone-1 was used to conduct additional Internet searches, including "warrant to seize property" and "illegal search and seizure," which directed to articles on those topics. During the Subject

Flight, Osorio Phone-1 was also used to take numerous photographs of contact phone numbers on the Ruhani Device.

The Subject Flight landed at JFK Airport at approximately 11:23 p.m. Once the Subject Flight landed at JFK Airport, data from the CSLI Warrants showed that the Ruhani Device was powered on and located in the vicinity of JFK Airport. The Ruhani Device then ceased emitting location information, indicating that it likely had been powered off.

Shortly thereafter, just as "Sonny" had directed, Ruhani exited the Subject Flight alone. The defendant did not exit the Subject Flight alongside Ruhani, even though the two were sitting in adjoining seats and traveling under the same reservation. Upon exiting the Subject Flight, Ruhani was taken into custody, and law enforcement agents searched Ruhani's person and belongings for electronic devices pursuant to the Device Warrants. The search revealed that Ruhani had two cell phone chargers in a bag that he was carrying, but he did not have the Ruhani Device or any other electronic devices.

After determining that Ruhani did not possess any electronic devices, law enforcement agents looked for the defendant at JFK Airport, located her in a public concourse in Terminal 5 of JFK Airport, and approached her. Federal Bureau of Investigation ("FBI") Special Agent Jason Moritz identified himself and asked the defendant if she was traveling with anyone else. The defendant falsely responded that she was not traveling with anyone and then said that she was going to record their encounter. The defendant then held up a cellular telephone and initiated a video recording of the encounter.

As described in more detail in the government's opposition to the defendant's motion to suppress, ECF No. 66, during the course of an approximately four-minute exchange, Special Agent Moritz told the defendant that he had reason to believe she was traveling with

someone else, that lying to a federal agent is a crime, and that if she was given any electronic devices she could be committing obstruction of justice. The defendant stated that she did not have any devices on her person that did not belong to her. At the conclusion of the exchange, the defendant walked away from the agents and left the airport.

As subsequently evidenced in the defendant's recorded phone calls with Ruhani, it appears that the defendant then met with an associate of Ruhani and gave him one of Ruhani's cellular telephones and jewelry belonging to Ruhani. The defendant then returned to her residence in Fort Lee, New Jersey, (the "Osorio Residence").

After midnight on that same night, the defendant (using Osorio Phone-1) began a text message conversation with a person saved in her phone as "Preme,"[5] stating: "call me asap doesn't matter the time[,]" and "urgent[.]" The following day, June 11, 2025, the defendant sent "Preme" a link to a news article announcing the indictment of Zeno and Ruhani. In response, "Preme" asked the defendant if they should "get the car back from Prince[,]" and the defendant responded that she would call him. These text messages were subsequently deleted from Osorio Phone-1.

On June 11, 2025, Ruhani was arraigned on the Charged Offenses in Courtroom 2A of the United States District Court for the Eastern District of New York in Brooklyn, New York ("Courtroom 2A"). The defendant appeared at Ruhani's arraignment seeking to serve as a suretor for Ruhani and spoke with the government. During the course of the interview, the defendant provided her phone number, which was the phone number for Osorio Phone-1. The defendant also stated that she had been involved in a romantic relationship with Ruhani for a couple of months.

---

5 The investigation has identified "Preme" as an associate of Ruhani.

The defendant falsely stated that she did not take possession of Ruhani's property, did not take possession of his cell phone, and did not know what happened to his cell phone. At the conclusion of the interview, the defendant was served with a grand jury subpoena to produce any electronic devices belonging to Ruhani in her possession, custody, or control forthwith. The defendant never did so.

The next day, June 12, 2025, at approximately 1:02 p.m., the defendant engaged in a recorded telephone call with Ruhani, who was incarcerated at the Metropolitan Detention Center ("MDC") in Brooklyn, New York. During the call, Ruhani asked, in sum and substance, the defendant to contact an individual ("Individual-3") on Ruhani's behalf. Ruhani told the defendant to "go to the phone that you have" to look up the phone number for Individual-3. A few hours later, at approximately 5:29 p.m., the defendant engaged in another recorded telephone call with Ruhani at the MDC. During the call, Ruhani asked, in sum and substance, whether the defendant had been able to speak with Individual-3. The defendant confirmed that she had been able to obtain the telephone number for Individual-3.

Later that evening, at approximately 7:48 p.m., "Preme" messaged the defendant: "Phone with black now[.]" The defendant responded, "copy[.]" These messages were subsequently deleted from Osorio Phone-1.

On or about June 13, 2025, the defendant (through Osorio Phone-1), engaged in additional Internet searches, including "lil Kim perjury" and "evidence cell phone."

On or about June 14, 2025, the government served a second grand jury subpoena on the defendant through her retained counsel. The second subpoena required the defendant to produce all cellphone photographs and videos from her interaction with law enforcement at JFK Airport on or about June 10-11, 2025. The defendant never did so.

The same day, the defendant (through Osorio Phone-1) engaged in additional Internet searches, including "cell phone tower ping accuracy[,]" "How accurate is cell tower triangulation[,]" "lying to fed charge[,]" and "if phone on airplane mode, can it ping a tower[.]"

On or about June 15, 2025, at approximately 1:31 p.m., and June 16, 2025, at approximately 6:53 p.m., the defendant engaged in recorded telephone calls with Ruhani at the MDC. During these calls, Ruhani indicated that he had sent text messages to the defendant on a contraband phone used by Ruhani at the MDC. Specifically, on the June 16 call, the defendant stated, "I text you," and on the June 15 call, Ruhani stated, "I text you that I don't know if you got my text man." In addition, Osorio Phone-1 was found to contain an image, dated June 27, 2025, which appears to depict the defendant having a video call with Ruhani via a cellular telephone while Ruhani is incarcerated. Cellular telephones are prohibited in the MDC, and Ruhani could not have sent a text message to the defendant without possessing a contraband cellular telephone.

The MDC requires inmates to register individuals that they will call and provide the phone numbers for those individuals and to only call those individuals using the inmate's own unique identification code. Ruhani had registered Osorio Phone-1 with the MDC as the phone number for the defendant. Beginning on or about June 16, 2025, in an effort to conceal his discussions with the defendant from law enforcement, Ruhani began calling a different phone number for the defendant, Osorio Phone-2, using unique identification codes for accounts held by other inmates at the MDC. On or about June 18, 2025, at approximately 5:29 p.m., the defendant, using another inmate's unique identification code, engaged in a recorded telephone call with Ruhani at the MDC using Osorio Phone-2, which was not registered with the MDC. During this call, the defendant told Ruhani that, "when I left that night," she had met with another associate of Ruhani and that "he took one of your, and I took one," without finishing the sentence for what

specifically was taken. She also stated "he didn't know I had the other one. He wanted all of your stuff." The defendant also told Ruhani that she had given the associate Ruhani's jewelry.

On June 25, 2025, the Honorable Leda Dunn Wettre, United States Magistrate Judge for the District of New Jersey, issued warrants authorizing the search of the defendant's person, residence, and vehicle, as well as the search of any electronic devices found therein. On or about July 2, 2025, FBI agents executed these warrants. During their search of the Osorio Residence, FBI agents recovered approximately fourteen electronic devices, a Faraday bag (which is a portable container designed to block cellular and wi-fi signals to and from an electronic device), and hand-written notes, including a hand-written document that appears to memorialize the defendant's consideration of an argument that Ruhani gave her the Ruhani Device as a gift, and therefore she did not lie to the FBI.

On or about June 26, 2025, in another call using another inmate's unique identification code, Ruhani instructed the defendant to obtain a new phone number without her personal information, telling her: "Don't set it up with you." The defendant agreed to "set it up with somebody else." In another call that evening, Ruhani directed the defendant to go to a store where she could get a phone "on the Jane Doe side."

During the search of one of the seized devices—Osorio Device-1—FBI agents obtained the video that the defendant had recorded of her interaction with FBI agents at JFK Airport. In addition, the agents recovered substantial additional evidence showing that the defendant had taken possession of Ruhani's cellphone, obstructed the investigation, and lied to FBI agents, including Internet searches such as: "if phone on airplane mode, can it ping a tower," "intent in destroying evidence," and "faraday bag."

## PROCEDURAL HISTORY

On December 15, 2025, a grand jury returned a superseding indictment charging the defendant and Ruhani with concealment of evidence in violation of Title 18, United States Code, Section 1519 (Count Seven) and obstruction of justice, in violation of Title 18, United States Code, Section 1512(c)(2) (Count Eight). See ECF No. 31. The superseding indictment also charged the defendant with two counts of making false statements in violation of Title 18, United States Code, Section 1001(a)(2) (Counts Nine and Ten). See id.

On April 8, 2026, the defendant filed a motion to suppress (1) her statements to law enforcement agents at JFK Airport and outside Courtroom 2A; and (2) all evidence identified as the fruit of the searches of her person, residence, and vehicle on July 2, 2025. See ECF No. 58. The defendant argued that her statements were the product of an unlawful seizure in violation of the Fourth Amendment and custodial interrogation absent Miranda warnings in violation of the Fifth Amendment. See id. The defendant also argued that the Subject Warrants were obtained as a result of these statements, lacked probable cause, and omitted material facts. See id. On April 23, 2026, the government filed its opposition to the motion to suppress, see ECF No. 66, and on April 30, 2026, the defendant filed her reply, see ECF No. 69. The fully briefed motion to suppress is currently pending before the Court. Trial is scheduled to begin on June 1, 2026.

## ARGUMENT

### I. Limited Evidence Demonstrating the Existence of an Investigation into the Underlying Scheme is Admissible

At trial, the government intends to offer limited background evidence of: (1) the FBI's investigation into Ruhani's fraud and embezzlement scheme; (2) the Device Warrants for the Penthouse, Ruhani, and the other Subjects, as well as the CSLI Warrant for the Ruhani Device; and (3) the indictment of Ruhani. Such evidence will consist primarily of limited additional

testimony from law enforcement witnesses who are already expected to testify at trial with respect to other aspects of the case, as well as a few documents and photographs.

A. Applicable Law

1. The Charged Crimes

a. Concealment of Evidence

To prove a violation of Section 1519, the government must prove: (1) the defendant concealed any record, document, or object that can be used to record or preserve information as alleged in the Indictment; (2) the defendant acted knowingly; and (3) the defendant acted with the intent to impede, obstruct or influence an investigation (or a matter) within the jurisdiction of (or in relation to or in contemplation of) a department or agency of the United States Government. See Sand, 2 Modern Federal Jury Instructions - Criminal ¶ 46.13 (2026) (hereinafter, "Sand, Modern Federal Jury Instructions").

b. Obstruction of an Official Proceeding

To prove a violation of Section 1512(c)(2), the government must prove: (1) the defendant obstructed, influenced, or impeded an official proceeding, or attempted to do so; (2) in the course of doing so, the defendant committed or attempted to commit an act that impaired the integrity or rendered unavailable records, documents, objects, or other things for use in the official proceeding; (3) the defendant intended to impair the integrity of or render unavailable such records, documents, objects, or other things for use in the official proceeding; and (4) the defendant acted corruptly. See Fischer v. United States, 603 U.S. 480 (2024).

c. Making False Statements

To prove a violation of Section 1001(a)(2), the government must prove: (1) the defendant made a statement or representation; (2) the statement or representation was material; (3) the statement or representation was false, fictitious or fraudulent; (4) the false, fictitious or

fraudulent statement or representation was made knowingly and willfully; and (5) the statement or representation was with respect to a matter within the jurisdiction of the government of the United States. See Sand, 2 Modern Federal Jury Instructions - Criminal ¶ 36.01 (2026) (collecting cases); see also United States v. Coplan, 703 F.3d 46 (2d Cir. 2012).

2. Background Evidence

In the context of obstruction charges, courts regularly admit evidence regarding underlying investigations that is "necessary to complete the story of how [the defendant] came to obstruct justice." United States v. Servider, No. 15-CR-174 (ENV), ECF No. 163 (May 10, 2018); see also United States v. Rosario, No. 22-CR-355 (ENV), ECF No. 151 (Feb. 10, 2025).

Moreover, testimony about the background of an investigation is not hearsay where it is not being offered for its truth—that is, to prove the defendant engaged in the underlying offenses—but is instead offered to establish the existence of the investigation that the defendant attempted to obstruct. See, e.g., United States v. Slaughter, 386 F. 3d 401, 403 (2d Cir. 2004) ("Testimony containing hearsay may be admissible not for its truth but as background information if (1) the non-hearsay purpose by which the evidence is sought to be justified is relevant, and (2) the probative value of this evidence for its non-hearsay purpose is [not] outweighed by the danger of unfair prejudice resulting from the impermissible hearsay use of the declarant's statement.") (citations omitted); see also United States v. Walsh, 7 F. App'x 20, 23 (2d Cir. 2001) (concluding that testimony was properly permitted because "the government's questioning and the testimony elicited was merely background information regarding the FBI investigation") .

B. Discussion

At trial, the government anticipates establishing that, at the time the defendant concealed Ruhani's cellular telephone: (i) the FBI was conducting an ongoing investigation into

Zeno and Ruhani's fraud against the Organization, (ii) the grand jury had returned an indictment against Zeno and Ruhani in connection with that investigation, (iii) the FBI had obtained the Device Warrants in connection with that investigation, and (iv) Ruhani was arrested pursuant to a judicially authorized arrest warrant. The government also intends to show that Ruhani was arraigned on June 11, 2025.

Such evidence is necessary to prove certain elements of the charges against the defendant, namely, the existence of both a federal investigation (see 18 U.S.C. §§ 1519, 1001) and an official proceeding (see 18 U.S.C. § 1512) that the defendant intentionally obstructed. In order for the government to meet its burden of proof as to these elements, the jury must be informed that when the defendant's obstructive conduct commenced, the FBI was in the process of executing search warrants for electronic devices in connection with its investigation into the Organization. That information is also necessary for the jury to understand multiple aspects of the case, for example:

- The Device Warrants were obtained to authorize the seizure of devices from the Subjects, which led two of the Subjects—after having their phones seized—to tip off Ruhani and the defendant, which led the defendant to conduct the Internet searches about the Organization (demonstrating her knowledge of Ruhani's criminal conduct), and resulted in the defendant engaging in her subsequent crimes: concealing Ruhani's devices and then lying about it to the FBI.

- The investigation also led to the warrant to search the Penthouse, which led "Sonny"—after going to the Penthouse—to tell the defendant about the search, and led the defendant to conduct Internet searches about search warrants, and which further demonstrated her knowledge of the ongoing investigation, which she subsequently obstructed.

Similarly, the fact that Ruhani was indicted, arrested, and arraigned is crucial for the jury to understand how the defendant came to be outside Courtroom 2A the following day, and for what purpose. To truncate the narrative of the trial without offering any explanation for how

the FBI twice came to interact with the defendant would confuse the jury and provide an incomplete picture of relevant events.

II. Evidence of the Defendant's Full Course of Obstructive Conduct Should be Admitted

Count Eight of the Superseding Indictment charges the defendant with engaging in an obstruction scheme on or about and between June 10, 2025, and June 16, 2025. See ECF No. 31 ¶ 30. In addition to evidence of the obstructive conduct specifically listed in the Superseding Indictment, the government intends to offer evidence of other examples of the defendant's obstructive conduct that were part of the same scheme. Namely, the government will offer evidence demonstrating that the defendant communicated with Ruhani in numerous ways that violated MDC policy in an effort to conceal their communications from law enforcement, including purchasing a "burner" cellphone. Even though certain communications relating to the burner phone post-date the precise time period charged in the Superseding Indictment, such evidence is nevertheless admissible because it is part of the charged obstruction scheme. In addition, a recorded phone call to be offered at trial will show that the defendant took possession not only of Ruhani's cellular telephone, but also of his jewelry. Accordingly, when she told federal agents on June 11, 2025, that she had not taken the defendant's property, she was lying both about cellphone and about the jewelry.[6]

A. Applicable Law

Where an indictment alleges conduct that occurred "on or about" specified dates, "the government is not required to prove that the crime occurred on exactly the date named, but only that it occurred on a date that is reasonably near to the date stated." United States v.

---

[6] In her motion to suppress, the defendant acknowledges that she stated on an MDC call with Ruhani that she took Ruhani's jewelry and provided it to one of his associates. See ECF No. 58, at 32 (arguing that the defendant took Ruhani's jewelry, not his phone).

McGee, 564 F.3d 136, 142 (2d Cir.2009) (quotation marks omitted); see also United States v. Nersesian, 824 F.2d 1294, 1323 (2d Cir.1987) ("Where 'on or about' language is used, the government is not required to prove the exact date, if a date reasonably near is established.").

Moreover, evidence that post-dates the charged scheme – here by just ten days – may still be admissible. See United States v. Mostafa, 16 F. Supp. 3d 236, 268 (S.D.N.Y. 2014) ("The fact that evidence predates or postdates the charged conduct does not alone predetermine its relevance or admissibility."); United States v. Abu-Jihaad, 630 F.3d 102, 132 (2d Cir. 2010) (admission of recorded conversations made four years after charged conduct was not error).

B. Discussion

The defendant's agreement to use a "burner" phone at Ruhani's direction, and their efforts to conceal their conversations from the government by violating MDC policies meant to assure transparency about inmate communications, are part of the same obstructive conduct as the charged crimes. The very communications between Ruhani and the defendant that will be introduced at trial were exchanged in a manner that circumvented MDC policies. The defendant's use of a burner phone in particular shows her criminal mental state and demonstrates her consciousness of guilt. Both her violation of MDC policies and her commitment to obtain a burner phone therefore "arose out of the same transaction or series of transactions as the charged offense [and are] inextricably intertwined with the evidence regarding the charged offense." See United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (quoting United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997)).

Such evidence may be admitted even though it slightly post-dates the date range charged in the Superseding Indictment, because such evidence is highly probative of the defendant's guilt. Such evidence clearly shows that, even besides concealing Ruhani's cellular

telephone, the defendant continued to engage in an ongoing obstruction and concealment scheme with Ruhani, of which hiding Ruhani's electronic devices and lying about it were only one part. While the Superseding Indictment charges the defendant with committing obstruction of justice on or about and between June 10, 2025 and June 16, 2025, the defendant's agreement with Ruhani to buy and use a burner phone after that date and their continued communications with other inmates' identification codes are relevant evidence of her intent to conceal his communications from continuing law enforcement scrutiny.

Therefore, the government should be permitted to present evidence and argument that the defendant communicated with Ruhani in ways that violated MDC policies and agreed to obtain and use a "burner" phone at Ruhani's direction, even though some of that evidence occurred after the date range charged in the Superseding Indictment.

## III. The Court Should Preclude the Defendant from Re-Litigating Legal Issues Determined by the Court in the Motion to Suppress

The defendant's motion to suppress is pending. Should the Court deny the motion and conclude (a) that the defendant's statements to law enforcement agents did not violate Miranda or the Fourth Amendment, and (b) that the search of the defendant's residence was lawful, the defendant should be precluded from re-litigating these issues before the jury.

Rule 104 of the Federal Rules of Evidence makes clear that the Court decides "preliminary question[s]" outside the presence of the jury, including whether or not evidence is admissible. See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether . . . a privilege exists, or evidence is admissible."), 104(c) ("The court must conduct any hearing on a preliminary question so that the jury cannot hear . . . ."). Legal issues such as the validity of a search and the voluntariness of a statement are preliminary questions for the Court that should not be considered by a jury at trial. See, e.g., United States v. Lights, No. 15-CR-721

(RWS), 2016 WL 7098633, at *1-2 (S.D.N.Y. Dec. 5, 2016) ("The stop and subsequent searches were all based on valid probable cause. . . . This issue has been litigated and decided. No reference to the illegality of the stop or subsequent searches will be permitted at trial . . . .") (internal citation omitted). Indeed, the government anticipates that it will request that the jury be instructed that the government's use of evidence obtained pursuant to the search warrant is "entirely lawful." See, e.g., Jury Instructions, United States v. Reynaldo Neseosupe, No. 19-CR-424 (FB) (E.D.N.Y.), ECF No. 75, at 15 (Evidence Obtained Pursuant to Searches); Jury Instructions, United States v. Shakeem Rankin, No. 23-CR-24 (MKB) (E.D.N.Y.), ECF No. 62, at 13 (Evidence Lawfully Obtained).

Here, the Court is deciding the preliminary questions pursuant to Federal Rule of Evidence 104(a)—whether the defendant's statements to law enforcement were in violation of Miranda and whether the search of the defendant's residence was lawful. Assuming the Court denies the motion, the defendant should be precluded from re-raising claims that the defendant's statements were in violation of Miranda, were not knowingly and voluntarily given, or that the search was improperly executed. Permitting the argument that evidence was illegally obtained by law enforcement would flout Rule 104 and improperly invite a mini-trial on the scope of the Fourth and Fifth Amendments. Such argument is outside the province of the jury, which is to determine based on the evidence presented whether the defendant committed the crimes at hand.[7]

---

[7] There is a limited exception to this rule when a defendant makes a false confession to law enforcement. See Crane v. Kentucky, 476 U.S. 683, 690 (1986). In such cases, a defendant may argue that her statements were coerced, even if a court has previously concluded that the same statement was voluntary. See United States v. Ramsey, No. 21-CR-495 (ARR), 2023 WL 2523193, at *8-*9 (E.D.N.Y. Mar. 15, 2023). However, here, the defendant's position is that she made truthful statements to the FBI.

Moreover, the legal matters addressed in the pending motion to suppress are irrelevant under Rule 401 because they have no bearing on the material facts the government will prove to demonstrate the defendant's guilt. Pursuant to Rule 401 of the Federal Rules of Evidence, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Generally, relevant evidence is admissible and "[i]rrelevant evidence is not admissible." See Fed. R. Evid. 402. "[T]he district court has broad discretion to exclude evidence that is irrelevant . . . ." United States v. Edwards, 631 F.2d 1049, 1051 (2d Cir. 1980); see also Fed. R. Evid. 403. Even if such arguments were relevant (which they are not), putting them before the jury would be more prejudicial than probative and risk confusing the issues or misleading the jury. See Fed. R. Evid. 403.

Accordingly, the Court should preclude the defendant from asserting or re-litigating issues that will have already been decided by the Court on the motion to suppress, including by asking questions attempting to elicit this information during the cross-examination of law enforcement witnesses.

## IV. The Court Should Permit the Government to Introduce the Defendant's Inculpatory Statements from a Video Recording and Preclude the Defendant from Introducing Her Own Self-Serving Statements

The government may move to admit excerpts of the video recovered from Osorio Phone-1 depicting her interaction with FBI agents at JFK Airport.[8] Specifically, the government expects to move to admit the following portions of this video:

- 00:00-00:17, in which FBI Special Agent Jason Moritz identifies himself and advises the defendant that lying to a federal agent is a crime.

[8] The government understands that this video was previously provided to the Court as Exhibit 2 to the defendant's motion to suppress. See ECF No. 58-2.

- 00:24-00:45, in which Special Agent Moritz again advises the defendant that lying to a federal agent is a crime and that, if she was given any electronic devices, she could be committing obstruction of justice.
- 01:00-01:25, in which Special Agent Moritz informs the defendant that he has a search warrant for the electronic devices of the person she was traveling with.
- 01:34-02:06, in which Special Agent Moritz repeats that he has a search warrant, and the defendant states that she does not have any devices on her person that do not belong to her.

The proffered evidence is relevant to and highly probative of the defendant's guilt, and admissible under the Federal Rules of Evidence. The defendant's statements are non-hearsay admissions of an adverse party pursuant to Rule 801(d)(2)(A) of the Federal Rules of Evidence. United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982). The statements of law enforcement officers in the excerpted videos are also admissible non-hearsay statements because the government is not seeking to admit law enforcement's statements "to prove the truth of the matter asserted." Fed. R. Evid. 801(c), 802. Rather, the government seeks to admit the officers' statements to show the defendant's state of mind, specifically her awareness of the representations being made by Special Agent Moritz, and thereby provide context for the defendant's own reciprocal statements, one of which forms the basis for a false statement with which she is charged. See, e.g., United States v. Paulino, 445 F.3d 211, 216 (2d Cir. 2006) (observing longstanding rule that "[s]o long as . . . statements are not presented for the truth of the matter asserted, but only to establish a context . . . the defendant's Sixth Amendment rights are not transgressed"); United States v. Barone, 913 F.2d 46, 49 (2d Cir. 1990) (the district court properly admitted evidence of an informant's recorded statements during a conversation with the defendant where they were presented not for the truth of the matter asserted, but to establish a context to assist the jury with understanding the defendant's admissions); United States v. Perez, No. 05-CR-441 (PKL), 2005 WL 2709160, at *2

(S.D.N.Y. Oct. 20, 2005) (admitting third-party informant statements in recorded conversations with co-conspirator where government offers statements to place the co-conspirator's own statements in context). Thus, the government respectfully requests that it be permitted to admit these portions of the video at trial.

However, the defendant should be precluded from introducing any of her own video-recorded statements, including her statements that she would not speak to agents without an attorney.

First, as set forth in Section III above, the remainder of the video—which consists largely of the defendant repeating that she would not answer questions without an attorney—is not relevant to any issue to be decided by the jury. The only conceivable purpose of introducing such evidence would be to improperly invite the jury to conclude that law enforcement agents violated the defendant's Fifth Amendment rights. As argued above, this is a question to be decided by the Court, not the jury. Moreover, it invites nullification.

Second, the rule of completeness does not require that the defendant's non-inculpatory statements be admitted simply because the government is seeking to admit her inculpatory statements. The Second Circuit has "interpreted [the doctrine of completeness] to require that a statement be admitted in its entirety when this is necessary to explain the admitted portion, to place it in context, or to avoid misleading the trier of fact, . . . or to ensure a 'fair and impartial understanding' of the admitted portion." Marin, 669 F.2d at 84 (quoting United States v. Capaldo, 402 F.2d 821, 824 (2d Cir. 1968) (collecting cases)). This is true "even though a statement may be hearsay." Coplan, 703 F.3d at 85 (quoting United States v. Kopp, 562 F.3d 141, 144 (2d Cir. 2009)). However, "[t]he rule of completeness is 'not a mechanism to bypass hearsay rules for any self-serving testimony.'" United States v. Blake, 195 F. Supp. 3d 605, 610 (S.D.N.Y.

2016) (quoting United States v. Gonzalez, 399 F. App'x 641, 645 (2d Cir. 2016) (summary order)). Accordingly, the doctrine of completeness "does not . . . require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." Kopp, 562 F.3d at 144.

Moreover, the Second Circuit has repeatedly held that, where, as here, the defendant's self-serving statements are not needed to contextualize the government's proffered evidence or provide a "fair and impartial understanding" of any statement the government may offer, the rule of completeness does not require the admission of even exculpatory statements by the defendant. See, e.g., United States v. Lange, 834 F.3d 58, 79 (2d Cir. 2016) (holding that the "omitted statements were generally post-hoc explanations for prior conduct, which did not alter the meaning of the admitted redacted portion" and thus not necessary to be admitted); United States v. Hill, 658 F. App'x 600, 605 (2d Cir. 2016) (summary order) (affirming district court's parsing of a defendant's recorded statement to admit the discrete inculpatory statements and exclude the other self-serving statements that he was "innocent"); United States v. Johnson, 507 F.3d 793, 796-97 (2d Cir. 2007) (holding that the court properly bifurcated a defendant's post-arrest statement and precluded the defense from introducing a self-serving portion of the defendant's post-arrest statement); United States v. Jackson, 180 F.3d 55, 73 (2d Cir. 1999) (finding no error with the district court's decision to exclude the remainder of the defendant's conversation given that "the portions of the tape proffered by [the defendant] consisted largely of [his] own self-serving statements, which, as offered by him, are inadmissible hearsay"); United States v. Black, No. 13-CR-316 (DLI), 2014 WL 5783067, at *2 (E.D.N.Y. Nov. 5, 2014) (precluding defendant from introducing the self-serving, exculpatory statements he made to law enforcement officers, whether through cross-examination or as direct evidence).

Here, the defendant's self-serving statements in which she refused to speak to federal agents without an attorney are not "necessary to explain" her subsequent false statements to agents. United States v. Williams, 930 F.3d 44, 60 (2d. Cir. 2019). Accordingly, the government respectfully requests that only the defendant's inculpatory statements be admitted at trial. The defendant is free to take the stand and testify on her own behalf. She should not, however, be permitted to offer her own prior statements, which are inadmissible hearsay.

## V. The Defendant's Inculpatory Communications with Co-Conspirators Are Admissible if Offered by the Government

The government intends to introduce communications between the defendant and others, including recorded phone calls between the defendant and Ruhani and text messages between the defendant and uncharged co-conspirators. These calls and text messages demonstrate, among other things, the defendant's knowledge of the federal investigation, her possession of Ruhani's cellular telephone after his arrest, her intent to conceal Ruhani's property from law enforcement, and her willingness to do whatever Ruhani asked of her.[9]

The defendant's own statements to others, whether by telephone or text message, are clearly non-hearsay and admissible for their truth pursuant to Federal Rule of Evidence 801(d)(2), as the government will establish at trial that the defendant, in fact, made these statements.

---

[9] Because the communications are direct evidence of the charged conduct, the government is not seeking to admit them under Federal Rule of Evidence 404(b). See, e.g., United States v. Smothers, 652 F. Supp. 3d 271, 302 (E.D.N.Y. 2023). Nevertheless, the communications would also be admissible under Rule 404(b) because they would be used to establish that the defendant intended to obstruct the government's investigation and to prove that she did not do so by accident or mistake. See, e.g., United States v. Brand, 467 F.3d 179, 197 (2d Cir. 2006), abrogated on other grounds by United States v. Cabrera, 13 F.4th 140 (2d Cir. 2021).

Statements made to the defendant by Ruhani during their recorded phone calls, and by other uncharged co-conspirators in text messages, are also admissible for their truth as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). Pursuant to Federal Rule of Evidence 801(d)(2)(E), a statement offered against an opposing party and "made by the party's coconspirator during and in further of the conspiracy" is not hearsay. "The law is well settled in this circuit that declarations that are otherwise hearsay may nevertheless be provisionally admitted, subject to eventual connection of the defendant with the conspiracy alleged, as long as the trial court is ultimately satisfied that the participation of the defendant against whom the declaration is offered has been established by a fair preponderance of the evidence independent of the hearsay utterances." United States v. Cambindo Valencia, 609 F.2d 603, 630 (2d Cir. 1979); see also United States v. Saneaux, 365 F. Supp. 2d 493, 497 (S.D.N.Y. 2005) ("[I]n this circuit, 'trial judges routinely admit[ ] coconspirator statements into evidence in the presence of the jury on a conditional basis, subject to the later submission of the necessary evidence.'"). "To admit a statement under the coconspirator exception to the hearsay definition, a district court must find two factors by a preponderance of the evidence: first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of the conspiracy." United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999). The conspiracy need not be charged in the indictment, "so long as the conspiracy is 'factually intertwined' with the offense being charged." United States v. Abouhalima, 201 F.3d 432 (2d Cir. 1999); see Gigante, 166 F.3d at 82.

"In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself." United States v. Gupta, 747 F.3d 111, 123 (2d Cir. 2014). "While

the district court may consider the hearsay statement itself to determine the existence of a conspiracy . . . 'there must be some independent corroborating evidence of the defendant's participation in the conspiracy.'" United States v. Padilla, 203 F.3d 156, 161 (2d Cir. 2000) (citation omitted).

As to the requirement that the statement be "in furtherance" of the conspiracy, "[t]he touchstone . . . is that the statement be designed to promote the accomplishment of the conspiracy's goals." United States v. Johnson, 469 F. Supp. 3d 193, 212 (S.D.N.Y. 2019) (citation omitted). Under this standard, a co-conspirator statement is admissible if it, for example, prompts the listener "to respond in a way that promotes or facilitates the carrying out of a criminal activity." United States v. Maldonado-Rivera, 922 F.2d 934, 958 (2d Cir. 1990). Out-of-court statements by co-conspirators that "provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy" are admissible. Gigante, 166 F.3d at 82.

Further, "so long as a coconspirator statement was in furtherance of the conspiracy, there is no requirement that it have been in furtherance of the interests of the defendant himself or of any particular coconspirator." Gupta, 747 F.3d at 124. Nor is it necessary that the defendant knew the co-conspirator who made the statement or the person to whom the statement was made. See United States v. Casamento, 887 F.2d 1141, 1157-58 (2d Cir. 1989) ("A lack of evidence connecting one defendant with others does not preclude a determination that all the defendants were co-conspirators; a single conspiracy may be found to link them all so long as each defendant knew from the scope of the operation that others were involved in the performance of functions vital to the success of the endeavor.").

Finally, the admission of co-conspirator statements in furtherance of a conspiracy is appropriate irrespective of whether the co-conspirator testifies, because "[i]n general, statements of co-conspirators in furtherance of a conspiracy are non-testimonial." United States v. Logan, 419 F.3d 172, 178 (2d Cir. 2005). "It is well established that the Confrontation Clause bars admission of testimonial statements" of non-testifying witnesses. United States v. Failing, 553 F. App'x 71, 72 (2d Cir. 2014) (quoting Davis v. Washington, 547 U.S. 813, 821 (2006)) (internal quotation marks omitted). Courts "determine whether a statement is or is not 'testimonial' by examining the declarant's awareness or expectation that his or her statements may later be used at a trial." Id. (quoting United States v. Farhane, 634 F.3d 127, 163 (2d Cir. 2011)) (internal quotation marks omitted). Where, as here, the at-issue co-conspirator statements were made prior to the defendant's arrest, they would have no expectation that the statements would be used at a trial. See Farhane, 634 F.3d at 163.[10]

The statements by Ruhani to the defendant described above are admissible for their truth because they are statements of a co-conspirator in furtherance of a conspiracy between the defendant and Ruhani to obstruct the government's investigation and conceal the Ruhani Device from law enforcement. Besides these statements by Ruhani, the government will also prove the conspiracy between the defendant and Ruhani through the independent corroborating evidence described above, such as her travel with Ruhani, her false statements to law enforcement agents, her Internet searches for topics relating to law enforcement's ability to collect evidence from cell phones, and the photographs found on Osorio Phone-1 that appear to depict the Ruhani Device during the Subject Flight.

---

[10] The government recognizes that its obligation under Giglio v. United States, 405 U.S. 150 (1972) extends to the hearsay declarants who made the co-conspirator statements in this context. See United States v. Jackson, 345 F.3d 59, 70-71, 71 n. 6 (2d Cir. 2003).

The statements and communications described above by uncharged co-conspirators, such as "Sonny" and "Preme," are admissible for their truth because they, too, are statements by co-conspirators in furtherance of their conspiracy with the defendant to conceal Ruhani's cell phone from law enforcement. The messages from "Sonny" advised the defendant and Ruhani that law enforcement would be waiting for them when their flight landed, that law enforcement had executed a search warrant at Ruhani's penthouse apartment, and that they should walk off the plane alone and remove any property that could be used as collateral. By informing Ruhani of the investigation, the execution of search warrants, and what he should do with his property, "Sonny" furthered the goal of the conspiracy: to prevent the seizure of Ruhani's property. Similarly, the message from Ruhani's associate "Preme" to the defendant—"Phone with black now"—is powerful evidence that the defendant was involved in the concealment of the Ruhani Device.

Such communications discussing the investigation against Ruhani and the disposition of the Ruhani Device were "designed to promote the accomplishment of the conspiracy's goals." Johnson, 469 F. Supp. 3d at 212; see Maldonado-Rivera, 922 F.2d at 958.

At trial, the government expects to demonstrate that individuals were conspiring with the defendant by both their statements and by independent corroborating evidence, such as the defendant's own text messages. See Padilla, 203 F.3d at 161 ("there must be some independent corroborating evidence of the defendant's participation in the conspiracy"). The Court should permit the admission of the statements into evidence subject to the government's ultimate demonstration that the co-conspirator exception applies. Saneaux, 365 F. Supp. 2d at 497.

The message from "Preme"—"Phone with black now"— is admissible as an adopted statement by the defendant irrespective of whether it is a co-conspirator statement. In

response to this message, the defendant stated: "copy[.]" Federal Rule of Evidence 801(d)(2)(B) provides that a statement is not hearsay if "[t]he statement is offered against an opposing party and . . . is one the party manifested that it adopted or believed to be true." Fed. R. Evid. 801(d)(2)(B). Here, the defendant's response of "copy" clearly conveyed that she understood and believed the statement by "Preme" to be true, thus adopting it as her own.[11] Where, as here, "the party unambiguously manifests adoption of another person's statement, the content of the statement need not be against his interest" in order to be admissible as non-hearsay. United States v. Shulman, 624 F.2d 384, 390 (2d Cir. 1980). This message from "Preme" and the defendant's response are also separately admissible to show her state of mind, namely, her belief that she had successfully disposed of Ruhani's cell phone.

Should the Court conclude that the offered statements do not fall within Rule 801(d)(2)(E), the electronic communications between the defendant and her uncharged co-conspirators would still be admissible for non-hearsay purposes. Even if the Court determined that these were not admissible co-conspirator statements, the statements made by the third parties the defendant messaged with are admissible because they place the defendant's statements in context and for their effect on the listener, i.e., the defendant. The jury should be permitted to read the statements of the third parties with whom the defendant engaged for the purpose of hiding Ruhani's cell phone from law enforcement because, besides being admissible co-conspirator statements, they also contextualize the defendant's own statements, show the effect of such

[11] This is also clear from the other instances in which the defendant uses the word "copy." For example, when "Preme" told the defendant that he was trying to get Ruhani's car to bring it to her, the defendant responded, "copy[,]" "im ready to meet you also[,]" indicating that she agreed with his plan and shared his intent.

statements on the defendant, and, most importantly, are critical evidence of the defendant's mental state, including her knowledge.

VI. The Court Should Preclude Evidence and Argument Regarding Whether the Defendant's Co-Conspirators Have Been Charged or Convicted for Obstructive Conduct

The Court should preclude the defendant from introducing evidence or argument concerning the government's charging decisions with respect to unindicted co-conspirators. In particular, the Court should preclude the defendant from making any argument about the fact that Ruhani is not on trial with the defendant (having pled guilty) or was not convicted of obstruction of justice.[12] The Court should also preclude the defendant from introducing evidence or making any argument that "Sonny" or "Preme" have not been charged in connection with their roles in the defendant's obstruction. Finally, the Court should preclude the defendant from arguing that the convictions of Ruhani and Zeno demonstrate that the information in Ruhani's cellular telephone was not "material" to the grand jury's investigation. That information is irrelevant to the defendant's culpability. Moreover, such evidence or argument would risk confusing the jury and invite the jury to draw improper inferences about the defendant's guilt or innocence.

Federal Rule of Evidence 401 classifies evidence as relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401; see also Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."); United States v. Inniss, No. 18-CR-134 (KAM), 2019 WL 6999912, at *6 (E.D.N.Y. Dec. 20, 2019). Federal Rule of Evidence 403 provides that "[t]he

[12] Ruhani has pleaded guilty to conspiracy to commit wire fraud for his role in the underlying fraud case, and the United States Sentencing Guidelines calculation that the government provided to the Court at his change of plea hearing included an enhancement for obstruction of justice, so any argument that he avoided punishment for his obstructive conduct would also be factually inaccurate.

court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

District Courts in this circuit routinely have precluded defendants from introducing evidence or eliciting testimony about the government's charging decisions pursuant to Rules 401 and 403. See, e.g., United States v. Boyle, No. 08-CR-523 (CM), 2009 WL 5178525, at *3 (S.D.N.Y. Dec. 23, 2009); United States v. Carneglia, No. 08-CR-76 (JBW), 2009 WL 185725, at *1 (E.D.N.Y. Jan. 27, 2009). Cf. United States v. White, 692 F.3d 235 (2d Cir. 2012) (rejecting blanket rule excluding evidence of charging decisions, and directing district courts to perform case-by-case analysis, pursuant to Rules 401 and 403, in determining whether to admit evidence of the government's charging decisions).[13]

In United States v. Watts, 934 F. Supp. 2d 451 (E.D.N.Y. 2013), Judge Matsumoto excluded evidence of the government's charging decisions after conducting a fact-based analysis. The defendant moved to cross-examine a government witness who had not been charged in the case about the government's favorable treatment of her. 934 F. Supp. 2d at 484. Judge Matsumoto denied the defendant's motion, holding that the proposed cross-examination would not tend to

---

[13] In White, the Second Circuit reversed the district court's holding that the government's charging decisions are never proper subjects for cross-examination or argument. "Particularly where the evidence is central to the defendant's claim of innocence, we find that categorical exclusion infringe[s] upon a weighty interest of the accused, and threatens the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." 692 F.3d at 246 (citations and quotation marks omitted). The White court emphasized that it was "not creating a per se rule of admissibility for charging decisions." Id. Rather, the Second Circuit directed district courts to perform a case-by-case analysis under Rules 401 and 403 before determining whether to admit or exclude the evidence. Id. at 246-47. Here, precluding evidence and argument related to whether Ruhani or other co-conspirators have been charged or convicted is consistent with White because such evidence is neither "probative of [the defendant's] innocence" nor "central to [her] defense."

prove that the defendant was innocent of the charged crimes, "nor otherwise lend weight to his defense." Id. at 485. In particular, Judge Matsumoto concluded that, even assuming the witness could also have been charged in the alleged conspiracy, the witness's criminal exposure "would not tend to prove that [the witness], rather than [the defendant], committed the offenses with which [the defendant] is charged, nor otherwise lend weight to his defense. This is because a conspiracy necessarily involves the agreement amongst more than one actor to engage in criminal conduct for which all members of the conspiracy may be found equally culpable." Watts, 934 F. Supp. 2d at 485.

The same is true here. Any evidence or argument concerning actions taken or not taken by the government with respect to any alleged co-conspirator is irrelevant to the issues for the jury at trial. Whether such individuals have been charged or convicted does not make it more or less probable that the defendant engaged in the alleged crimes. See id. Moreover, there are many considerations that influence whether and when a prosecuting authority may decide to bring charges against a particular individual, including timing issues, resources and other issues particular to that individual's case. See Inniss, 2019 WL 6999912, at *6.

Furthermore, the defendant should also be precluded from arguing that Zeno and Ruhani's convictions provide a defense to the charged crimes, or that her lies and obstructive conduct were not material and did not amount to obstruction because Zeno and Ruhani were subsequently convicted. With respect to 18 U.S.C. § 1001, the law is well-established that a defendant's lie is material if it is "capable of influencing" the government's decisions or activities. See, e.g., United States v. Adekanbi, 675 F.3d 178, 182 (2d Cir. 2012). Indeed, the standard jury instruction for Section 1001 provides that a statement is "material" even if the government is not misled and the lie did not actually influence the government's investigation: "actual reliance is not

required." Sand, Modern Federal Jury Instructions, Instruction 36-5; see United States v. White, 545 F. App'x 69, 72 (2d Cir. 2013). Similarly, Section 1519 only requires proof that the defendant concealed evidence "with the intent" to impede the government's investigation, 18 U.S.C. § 1519, and the defendant may be convicted for obstruction under Section 1512(c)(2) if she "obstruct[ed], influence[d], or imped[ed] an official proceeding, or attempt[ed] to do so." Id. § 1512(c)(2) (emphasis added). Accordingly, the fact that the government was able to secure the convictions of Ruhani and Zeno is irrelevant to whether the defendant engaged in the crimes of making material false statements or obstruction of justice.

Alternatively, even if such evidence or argument were relevant—and it is not—it should be precluded under Rule 403 because it is substantially more prejudicial, confusing, and misleading than probative. Any reference to a lack of charges against any of the defendant's co-conspirators could cause jurors to conclude improperly that their actions, and thus the defendant's actions together with them, did not constitute a crime. Admitting such evidence would also necessitate a trial-within-a-trial in order to present the jury with a complete and accurate picture of the government's charging decisions. See Carneglia, 2009 WL 185725, at *1-2 (precluding evidence of charging decisions because it would confuse and mislead the jury and otherwise waste time); United States v. Hill, No. 12-CR-214, 2014 WL 198813, at *2 (E.D.N.Y. Jan. 14, 2014), aff'd, 658 F. App'x 600 (2d Cir. 2016) (same). Similarly, arguments that the defendant's efforts to obstruct the government's investigation were ultimately unsuccessful because Zeno and Ruhani were convicted should be precluded because they invite nullification and are likely to confuse and mislead the jury and to waste time. Thus, such evidence should be precluded on these grounds as well.

## VII. The Court Should Permit the Government to Authenticate Certain Records by Certification

The government intends to authenticate certain evidence through business record and electronic record certifications under Federal Rules of Evidence 902(11), 902(13) and 902(14).

"The bar for authentication of evidence under Fed. R. Evid. 901(a) is 'not particularly high.'" United States v. Bout, 651 Fed. App'x 62, 63 (2d Cir. 2016) (quoting United States v. Gagliardi, 506 F.3d 140, 151 (2d Cir. 2007)). It is met where "sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." United States v. Tin Yat Chin, 371 F.3d 31, 38 (2d Cir. 2004).

Under Federal Rule of Evidence 902(11), evidence can be authenticated through a business record certification without the need to call a records custodian as a witness. This rule was created "so that the foundation requirements of Rule 803(6) [the business records exception to the hearsay rule] can be satisfied under certain circumstances without the expense and inconvenience of producing time-consuming foundation witnesses." United States v. Komasa, 767 F.3d 151, 155 (2d Cir. 2014). Business records can be authenticated by certificates if: (1) the records were "made at or near the time by—or from information transmitted by—someone with knowledge"; (2) the records were "kept in the course of a regularly conducted activity of a business, organization, occupation, or calling"; and (3) "making the record[s] was a regular practice of that activity." Fed. R. Evid. 803(6).

A certificate meeting the same requirements as a business records certification can also be used to authenticate "data copied from an electronic device, storage medium, or file" such as a cellular telephone. Fed. R. Evid. 902(14). Federal Rules of Evidence 902(13) and (14) provide a mechanism for parties to authenticate evidence generated by electronic processes or systems. These rules combine the conceptual frameworks of Rule 901(b)(9)—authentication by evidence

describing a process or system that produces an accurate result—and Rules 902(11) and 902(12)—self-authentication of business records. Specifically, Rule 902(13) allows authentication by certification of "[a] record generated by an electronic process or system that produces an accurate result," and Rule 902(14) does the same for "[d]ata copied from an electronic device, storage medium, or file, if authenticated by a process of digital identification." Included among these records are forensic images of cellular telephones and other electronic devices. See, e.g., United States v. Dunnican, 961 F.3d 859, 872 (6th Cir. 2020) (affirming district court's decision to admit text message evidence extracted from defendant's phone as self-authenticating under Rule 902(14)); United States v. Anderson, 563 F. Supp. 3d. 691, 695-96 (E.D. Mich. Sept. 27, 2021) (finding text messages self-authenticating under FRE 902(14)). Excerpts from such records that are generated using standard electronic systems and processes to generate copies for use in discovery and as trial exhibits are examples of data copied from an electronic device, storage medium, or file which may be authenticated by a process of digital identification. Accordingly, these items of electronic evidence can be authenticated, pursuant to Rule 902(13) and (14), by certification of competent technicians who performed the extractions and generated the copies rather than by the live testimony of those technicians.

In the context of business records, which provided the conceptual framework for self-authentication of electronic evidence under Rules 902(13) and (14), the Supreme Court has held that admitting evidence that has been authenticated by affidavit or certificate does not violate a defendant's right to confrontation because certifications are not testimonial. See Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009). Relying on Melendez-Diaz, the Second Circuit and at least five other circuits have concluded that certifications authenticating records are not testimonial and therefore are permissible. See, e.g., United States v. Qualls, 613 F. App'x 25, 28 (2d Cir. 2015);

United States v. Johnson, 688 F.3d 494, 504-05 (8th Cir. 2012); United States v. Yeley-Davis, 632 F.3d 673, 680-81 (10th Cir. 2011); United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007); United States v. Ellis, 460 F.3d 920 (7th Cir. 2006); United States v. Weiland, 420 F.3d 1062, 1077 (9th Cir. 2005). The facts concerning the electronic systems that generate electronic records and the processes of making electronic copies, like the processes of maintaining business records, are not testimonial because they only establish authenticity—that the records were generated by a reliable process and are what they purport to be—and can therefore be established by certification without implicating the Confrontation Clause. It is the underlying records, not the certification of a custodian or technician who maintained or electronically copied them, that are introduced to establish the facts at trial. Consistent with this understanding of the confrontation right, federal law permits the authentication by certification of business records, electronic records generated by reliable electronic processes, and reliable electronic copies.

Here, the government intends to authenticate certain evidence through business record certifications, including business records from Apple, T-Mobile, JetBlue, and the Bureau of Prisons. Each of these records will be accompanied by a certification from a custodian establishing that such records were made at or near the time by (or from information transmitted by) someone with knowledge, were kept in the course of a regularly conducted activity of the business or entity, and that making the record was a regular practice of that business or entity. See Fed. R. Evid. 803(6). Therefore, these records are properly authenticated through business record certifications. See Fed. R. Evid. 902(11).

The government also intends to seek to admit evidence taken from extractions for several cellphones, including cellphones used by the defendant described above. The contents of these devices were extracted by computer specialists with the FBI. In lieu of calling multiple FBI

witnesses to testify about the process of creating the extractions, the government expects to authenticate this evidence using certifications under Rule 902(13) and Rule (14).[14]

## VIII. The Defendant Should Be Precluded from Impeaching Witnesses with Agent-Prepared Interview Reports

The defendant should also be precluded from imputing to witnesses summaries of prior interviews prepared by law enforcement officers. While the government will produce summaries of witness interviews prepared by law enforcement to the defendant, the defendant should be precluded from introducing the contents of those reports to impeach such witnesses during cross-examination, publishing the contents of the reports to the jury, or otherwise suggesting to the jury that the reports are statements of witnesses who did not write, review, or adopt them.

### A. Legal Standard

A witness may be impeached with his prior inconsistent statement, but the statement must in fact be the witness' prior statement and he must be afforded an opportunity to explain or deny it. See Fed. R. Evid. 613(b). "[A] third party's characterization of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization." United States v. Almonte, 956 F.2d 27, 29 (2d Cir. 1992) (citation omitted). Thus, absent a witness's endorsement of another's characterization of his prior statement, the third party's notes or summary is irrelevant. Id. The burden of proving that the record actually reflects the witness's statement belongs to the party seeking to introduce it. Id.

---

[14] The government will work with defense counsel toward stipulations concerning electronic and business record evidence, which, if reached, will obviate the need for a ruling on authentication by certification.

The Jencks Act, which is codified in 18 U.S.C. § 3500, defines a witness's "statement" as "a written statement made by said witness and signed or otherwise adopted or approved by him;" a recording or transcription that "is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury." 18 U.S.C. § 3500(e). An "agent's interpretations or impressions" of a witness are not a witness's prior statement under the Jencks Act. Palermo v. United States, 360 U.S. 343, 352-53 (1959).

B. Discussion

The government has provided the defendant with discovery and will provide investigators' reports and notes summarizing interviews with witnesses. The government's prospective witnesses have not reviewed, approved, or adopted such reports drafted by the government's agents. The reports were drafted after interviews and meetings were completed and contain investigators' interpretations. They are not verbatim recitals or transcripts of witnesses' statements. Therefore, these reports are not the statements of any witness other than the law enforcement officer who authored them, should that person be called to testify as a witness. The reports cannot be used for impeachment purposes and should not be read aloud or shown to the jury. See Almonte, 956 F.2d at 29-30. The defendant should be precluded from suggesting or arguing that material in a law enforcement report is a witness' statement.[15]

[15] Based on the contents of a law enforcement report, the defendant may ask a witness whether he or she made a particular statement to law enforcement. However, if the witness denies making the statement, the defense should be precluded from publishing the report or otherwise introducing the report as the witness' prior inconsistent statement, and counsel should no longer question the witness on the statement. A report may be shown to the witness for purposes of refreshing the witness' recollection if the witness says he or she does not remember making a statement. This may only be done in a manner that does not suggest the report or its contents are

## IX. The Court Should Preclude Evidence and Argument Concerning Possible Punishment and Collateral Consequences

The Court should preclude the defendant from referencing at trial any consequences of her potential conviction. While the defense has not suggested that it intends to introduce any discussion of these consequences at trial, out of an abundance of caution, the government moves to preclude at trial any discussion of the defendant's possible punishment or collateral consequences of conviction.

Evidence regarding possible consequences the defendant may face if convicted should be precluded because it is not relevant. As stated above, evidence is relevant only if it tends to make a material fact more or less probable. "[T]he district court has broad discretion to exclude evidence that is irrelevant . . . ." United States v. Edwards, 631 F.2d 1049, 1051 (2d Cir. 1980); see also Fed. R. Evid. 403. The defendant's punishment is not a fact "of consequence" to be determined at trial. Therefore, any evidence of those issues is not relevant. See Shannon v. United States, 512 U.S. 573, 579 (1994) ("Information regarding the consequences of a verdict is . . . irrelevant to the jury's task.").

Such evidence is not only irrelevant, but it "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." Id. Indeed, jurors are routinely instructed not to consider a defendant's punishment in determining a defendant's guilt. See generally Sand, Modern Federal Jury Instructions, Instruction 9-1 (2017 ed.); see also Shannon, 512 U.S. at 579 (a jury "should be admonished to reach its verdict without regard to what sentence might be imposed [and] not to

---

the witness' prior statement and the report may not be published to the jury. See generally Order on Guidelines Regarding Appropriate Use of 302 Forms in Criminal Trials, United States v. Harrell, No. 20-CR-239 (BMC) (E.D.N.Y.), ECF No. 1634; Nov. 2, 2018 Order, United States v. Guzman Loera, No. 09-CR-466 (BMC) (E.D.N.Y.).

consider the consequences of their verdicts . . . ." (internal citation omitted)); United States v. Watts, 934 F. Supp. 2d 451, 464 (E.D.N.Y. 2013) ("[I]t is well-established precedent that jurors should not be informed about the possible consequences of their verdict due to the likelihood that prejudice, unfairness, and confusion that would result.").

Courts have routinely precluded evidence of the potential sentences defendants face on the grounds that such evidence is irrelevant, unfairly prejudicial and outside the province of the jury. See, e.g., United States v. Blume, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences"); see also United States v. Lewis, 110 F.3d 417, 422 (7th Cir. 1997) (holding that district court correctly refused to permit defendant to argue about the severity of his possible punishment); United States v. DiMarzo, 80 F.3d 656, 660 (1st Cir. 1996) (district court "soundly excluded" evidence of a potentially harsh sentence because such evidence "would have necessitated an unwarranted departure from the fundamental division of responsibilities between judge and jury."). In short, guilt should determine punishment, not the other way around. See United States v. Thomas, 116 F.3d 606, 614 (2d Cir. 1997) ("Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court . . . . We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that the courts may permit it to occur when it is within their authority to prevent."). Courts have consistently recognized that juries have no right to nullify, and "trial courts have the duty to forestall or prevent such conduct." Id. at 616. Therefore, the Court should preclude the defendant from referencing potential punishment and collateral consequences at trial.[16]

---

[16] To the extent that the defendant exercises her right to testify, the government should be permitted to cross-examine her regarding the potential consequences of conviction that she faces because, under those circumstances, it is relevant to the defendant's credibility as a witness. See Davis v. Alaska, 415 U.S. 308, 316 (1974) (discussing use of cross-examination to reveal "possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues

X. The Defendant Should Be Precluded from Introducing Evidence Regarding Her Lack of Criminal History

The Federal Rules of Evidence ordinarily prohibit witnesses from proving good character through specific instances of conduct. See Fed. R. Evid. 405(a). The Second Circuit has concluded, however, that evidence of a lack of prior convictions or arrests is admissible for the purpose of gauging the credibility of a testifying witness. See United States v. Blackwell, 853 F.2d 86, 88 (2d Cir. 1988) (noting the "relatively low probative value" of this evidence). Thus, such evidence becomes relevant and admissible if—and only if—the defendant testifies, and even then only for the limited purpose of providing background information relating to their credibility as a witness.

In addition, "[d]istrict courts have broad discretion to balance the probative value of evidence against possible undue sympathy or bias as well as prejudice." United States v. Miller, 641 F. Supp. 2d 161, 167 (E.D.N.Y. 2009). Courts may exclude evidence if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one[.]" Fed. R. Evid. 403, Adv. Comm. Notes. Indeed, when evidence is of limited probative value, it should be excluded if it has the "potential to engender sympathy in an inappropriate effort to excuse defendant's commission of the charged offenses." Miller, 641 F. Supp. 2d at 167; see also United States v. Paccione, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that the defendant had son with cerebral palsy); United States v. Battaglia, No. 05-CR-774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant

. . . in the case at hand. The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony." (internal quotation omitted)).

committed the crimes charged"); United States v. Harris, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

Consistent with Blackwell, the government requests that the defendant be precluded from informing the jury of her lack of criminal history, unless and until she chooses to testify. Counsel should not be permitted to advise the jury of the defendant's lack of criminal history in opening statements, through cross-examination or otherwise.

## XI. The Defendant Should Be Ordered to Disclose Rule 16(b) Discovery and Trial Exhibits to Be Introduced During the Government's Case

Rule 16(b) of the Federal Rules of Criminal Procedure governs a defendant's disclosures in a criminal case. In relevant part, it requires the defendant to provide the government with documents and records that the defendant "intends to use . . . in the defendant's case-in-chief at trial." Fed. R. Crim. P. 16(b)(1)(A).

Rule 16 does not require a defendant to disclose documents he intends to use for purposes of cross-examining a government witness. However, to the extent that a defendant seeks to admit into evidence a document while cross-examining a witness during the government's case-in-chief, in order to affirmatively support the defendant's theory of the case, such a document should be disclosed. As explained in United States v. Hsia, No. 98-CR-0057 (PLF), 2000 WL 195067, at *2 (D.D.C. Jan. 21, 2000):

> A "case-in-chief" is defined as "[t]he part of a trial in which a party presents evidence to support its claim or defense." Black's Law Dictionary 207 (7th ed. 1999). Defendant's cross-examination of government witnesses, and the evidence introduced during that cross-examination, certainly may be used to support her defense . . . . The cross-examination of these and other government witnesses therefore is properly seen as part of defendant's case-in-chief if it buttresses her theory of the case.

Id. The Hsia court distinguished documents introduced by a defendant via a government witness—which do fall within Rule 16 and should be disclosed—from documents used by a defendant "merely to impeach a government witness, and not as affirmative evidence in furtherance of [the defendant's] theory of the case, it is not part of [the defendant's] case-in-chief." Id. at *2 n.1.

Courts in this district have repeatedly held that the defense must produce in advance any "exhibit that will not be used solely for impeachment purposes," even if the defense intends to introduce such exhibit during cross-examination of a government witness. See Memorandum and Order at 17, United States v. Chen, No. 22-CR-158 (ENV), ECF No. 366 (Oct. 17, 2024) (directing defendants to disclose such material even if it was produced by the government in discovery); Smothers, 652 F. Supp. 3d at 308; see also United States v. Napout, No. 15-CR-252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017) (holding that "Rule 16 requires Defendants to identify all non-impeachment exhibits they intend to use in their defense at trial, whether the exhibits will be introduced through a government witness or a witness called by a Defendant."); ECF Order, United States v. Warren, No. 22-CR-231 (DLI) (Sept. 6, 2023). That obligation extends to material produced by the government in discovery that the defense intends to use as an exhibit. See Smothers, 652 F. Supp. 3d at 308 (requiring advance production of defense exhibits "regardless of whether such an exhibit is in the defense's sole custody"). Numerous other district courts have interpreted Rule 16(b) similarly. See United States v. Holden, No. 13-CR-444, 2015 WL 1514569, at *4 (D. Or. Mar. 19, 2015) (holding, based on Swenson and Hsia, that a defendant must disclose non-impeachment substantive evidence that the defendant seeks to use in examination of government or defense witnesses); United States v. Larkin, No. 2:12-CR-319 (GWF), 2015 WL 4415506, at *5 (D. Nev. July 20, 2015) (stating that the approach adopted in Holden, Swenson, and Hsia is "consistent with the structure and integrity of Rule 16(b)

as a whole"); United States v. Aiyaswamy, No. 15-CR-568 (LHK), 2017 WL 1365228, at *5 (N.D. Cal. Apr. 14, 2017) (same); see also United States v. Huntress, No. 13-CV-199S, 2015 WL 631976, at *34, n.1 (W.D.N.Y. Feb. 13, 2015) (observing that "it is not clear that defendants' case-in-chief would be limited to any case they may present after the government rests"); United States v. Swenson, 298 F.R.D. 474, 477 (D. Idaho 2014) ("Defendants have a duty to produce any exhibits they intend to use at trial during cross examination of a government witness other than for impeachment purposes.

Here, to date, the defendant has not disclosed any documents she intends to introduce at trial. Accordingly, to avoid gamesmanship and unfair surprise, the government respectfully requests that the Court order the defendant to identify any exhibits she intends to introduce during the government's case or any defense case no later than May 25, 2026, which is one week prior to the start of the trial.

Finally, the government respectfully submits that, to avoid delay in the upcoming trial, the Court should set a schedule for disclosure of the statements of any defense witnesses other than the defendants themselves. See Fed. R. Crim. P. 26.2. The government proposes that Rule 26.2 material should be provided no later than two days before a witness testifies, which is consistent with schedules set by other judges in this District. See, e.g., Memorandum and Order at 17–18, United States v. Chen, No. 22-CR-158 (ENV), ECF No. 366 (Oct. 17, 2024).

## CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court grant the government's motions in limine.

Dated: Brooklyn, New York
May 1, 2026

Respectfully submitted,

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By: ______________________
Russell Noble
Sean M. Sherman
Brooke E. Theodora
Assistant United States Attorneys
(718) 254-7000