

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

FTB:RWN
F. #2025R00028

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 21, 2026

<u>By ECF & E-Mail</u>

The Honorable Rachel P. Kovner
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:  United States v. Rashad Ruhani
>      <u>Criminal Docket No. 25-182 (S-1) (RPK)</u>

Dear Judge Kovner:

The government respectfully submits this letter in advance of the defendant Rashad Ruhani's sentencing hearing on July 28, 2026.

This case concerns the defendant's embezzlement of funds from a non-profit organization that provided legal services and community-support services to indigent residents of Queens, New York (the "Organization").  In his role as a leader of the Organization's youth program, the defendant stole funds that were meant to provide legal services for the most disadvantaged members of his community and spent them on extravagant personal expenses, including a vacation to Bali, a luxury resort in Santa Monica, an 85-inch television, and luxury clothes and handbags.  The defendant's betrayal of the Organization and its funders had massive repercussions, causing the Organization to lose its contract with New York City to provide criminal-defense services throughout Queens, close its criminal-defense practice, and shutter several other programs that provided meals and support to low-income members of the community.

The defendant pleaded guilty to one count of wire fraud conspiracy pursuant to a plea agreement, and the applicable sentencing range under the U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines") is 57 to 71 months' incarceration.  To properly reflect the egregious nature of the defendant's crimes and the lasting harm that he caused, and to deter others from similarly abusing their access to charitable organizations' funds, the Court should impose a sentence of 66 months' incarceration.

I.        Factual Background[1]

         A.  The Defendant's Fraud on the Organization

From approximately 2018 until January 2025, Lori Zeno served as the executive director of the Organization, a non-profit organization that represented criminal defendants and provided other legal and community-support services to indigent residents of Queens, New York. While serving as executive director, Zeno hired the defendant Rashad Ruhani to work at the Organization and began a romantic relationship with him. In August 2024, the defendant and Zeno were married in a religious ceremony. Also in the summer of 2024, Zeno promoted the defendant to a position managing the Organization's youth program and gave him a credit card tied to the Organization's bank account.

As described in the Indictment, from approximately June 2024 to January 2025, the defendant and Zeno misappropriated hundreds of thousands of dollars of the Organization's funds to enrich themselves and others. The defendant and Zeno charged personal shopping and personal travel expenses to Organization credit cards and received reimbursements from the Organization for rent at a luxury penthouse apartment (the "Penthouse Apartment"). Zeno also hired the defendant's relatives and associates for low-show or no-show jobs. Based on their misappropriation of the Organization's funds, the defendant and Zeno were both fired from the Organization.

The government's investigation found that, for over six months, the defendant and Zeno used the Organization's credit cards to fund their own lavish lifestyle. The defendant and Zeno charged extravagant purchases to the Organization's credit cards, including $3,300 for an 85-inch smart television to be installed at the Penthouse Apartment; $600 for teeth-whitening procedures for both of them; thousands of dollars in food deliveries to the Penthouse Apartment; and thousands of dollars at luxury retailers such as Ralph Lauren and Neiman Marcus. In one instance, the defendant and Zeno charged over $4,000 to an Organization credit card to buy a Louis Vuitton designer handbag.

The defendant and Zeno also used the Organization's credit cards to pay for personal vacations, most notably their honeymoon trip to Bali, which cost over $10,000. The defendant and Zeno redeemed thousands of dollars' worth of rewards points on an Organization credit card to buy airline tickets to Bali and lodging at a luxury hotel in Bali. While in Bali, the defendant and Zeno used an Organization credit card to pay for hotel expenses, food, and jewelry. Similarly, in December 2024, the defendant and Zeno used an Organization credit card to pay for over $1,700 in expenses at a resort in Santa Monica, California, including food, alcohol, and use of a vehicle, along with DoorDash deliveries to the resort.

While they spent the Organization's money on a lifestyle of luxury, the defendant and Zeno repeatedly lied to their colleagues about the expenses, submitting and causing the submission of fraudulent reports in the Organization's accounting system. For example, one

---

[1]        The following facts are derived from the Presentence Investigation Report ("PSR"), the indictment, and materials produced in discovery.

2

expense report for Zeno's credit card lists a $350 charge at a furniture store with the description "Main Office Couch." The store's records, however, show that this $350 charge was in fact a partial payment toward an Italian leather sofa and love seat that were delivered to the Penthouse Apartment. Zeno not only lied to the Organization about this purchase, she even lied to the vendor: she provided it with a tax-exempt purchase certificate swearing that the purchase was on behalf of the Organization to avoid paying sales tax on it. Similarly, charges on Zeno's credit card for the $3,300 Best Buy television, a $700 coffee table with refrigerated drawers, and a $600 area rug were reported to the Organization as "18-57 equipment," "18-57 furniture," and "18-57 rugs," respectively, indicating that they were intended to furnish an Organization building with that building number. In fact, each of these items was later found at the Penthouse Apartment.

Besides their misuse of the Organization's credit cards, the defendant and Zeno also submitted fraudulent requests to the Organization to obtain reimbursements for rent at the Penthouse Apartment. The defendant claimed that the purpose of the Penthouse Apartment was to provide housing for a homeless minor, while concealing from the Organization that he and Zeno were using the Penthouse Apartment for themselves as well. For instance, the defendant's Organization credit cards were used to pay for furniture to be shipped to, and installed at, the Penthouse Apartment and regular DoorDash deliveries to the Penthouse Apartment; the defendant and Zeno also repeatedly used Organization credit cards to pay for parking there, which they sometimes improperly reported as a business expense.

Between August and October 2024, the defendant received over $39,000 in reimbursements from the Organization for rent at the Penthouse Apartment despite the fact that it was Zeno, and not the defendant, who was paying the rent. The defendant and Zeno not only misrepresented who was paying for the Penthouse Apartment; they actively concealed Zeno's involvement from the Organization. In support of their reimbursement requests, they submitted pages of a lease agreement that were altered to hide the fact that Zeno was a listed occupant of the Penthouse Apartment. The defendants also submitted versions of the monthly rent statements that were altered to replace Zeno's name with the defendant's, further concealing Zeno's involvement with the Penthouse Apartment. In at least one instance, the defendant requested reimbursement from the Organization for rent that had not yet been paid, deposited the check issued by the Organization, then funneled the money from the Organization to Zeno, who paid that month's rent at the Penthouse Apartment. As with the altered lease documents, this circuitous flow of money served to conceal Zeno's role in paying for the Penthouse Apartment in which the defendant was living.

Zeno secured lucrative positions at the Organization for relatives and associates of the defendant who did little or no substantive work. In August 2024, Zeno hired two individuals ("Employee-1," the defendant's daughter;[2] and "Employee-2")—as her executive assistants, with respective salaries of $80,000 and $65,000. Employee-1 and Employee-2 each clocked into work only a single time during their entire monthslong period of employment. They were ostensibly

---

[2]    Employee-1 is the same daughter who submitted a letter of support attached to the defendant's sentencing memorandum. She was a direct participant in the defendant's fraud, received over $50,000 from the Organization for her low-show job, and was fired along with the defendant.

hired to assist the defendant and Zeno with submitting expense reports, many of which falsely claimed personal expenses as legitimate business expenses. For example, at the defendant's direction, Employee-2 falsely reported a charge of $3,265 on the defendant's credit card for a luxury handbag from Bloomingdale's as an expense for the Organization's "Client Closet"; similarly, Employee-2 reported a $165 charge on the defendant's credit card for a hoodie and sweatpants from Aritzia as for the "Client Closet," when in fact the defendant had bought this clothing for Employee-2. At the defendant's direction, Employee-2 even falsely reported a $414 charge on the defendant's credit card for perfume, soap, and facial cleansers from Aesop as a "Domestic violence expense."

Similarly, in November 2024, Zeno hired a woman whom the defendant had married in or around 2015 ("Employee-3") as the director of a non-existent "health and wellness" program with a salary of approximately $60,000. Not only did Employee-3 perform no substantive work for the Organization; the investigation indicates that for her entire period of "employment," she was not even present in the United States.

Ultimately, through their misuse of the Organization's credit cards, fraudulent reimbursement requests, and low-show or no-show jobs, the defendant and Zeno together embezzled or misapplied hundreds of thousands of dollars that were meant to fund legal services for indigent residents of Queens County.

On June 2, 2025, the defendant and Zeno were charged by indictment with one count of wire fraud conspiracy, in violation of 18 U.S.C. § 1349; three counts of wire fraud, in violation of 18 U.S.C. § 1343; one count of theft of federal funds, in violation of 18 U.S.C. § 666(a)(1)(A), and one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h).

B. The Defendant's Obstruction of the Investigation

On June 10, 2026, the defendant traveled with Kimberly Osorio from Los Angeles to John F. Kennedy International Airport ("JFK"). While their flight was en route, law enforcement agents seized cell phones from multiple other individuals pursuant to judicially authorized search warrants, including Employee-1 and Employee-2. The defendant spoke with both of them by phone during his flight. Knowing that law enforcement agents were executing search warrants relating to his fraud against the Organization, the defendant sought to prevent agents from seizing his cell phone by giving it to Osorio, who left the airport. The defendant was searched and found to have two cell phone chargers on his person, but no electronic devices.

The defendant was arraigned on June 11, 2026 and has been detained since his arrest. While incarcerated at the Metropolitan Detention Center ("MDC"), the defendant had numerous recorded phone calls with Osorio, and a review of these calls makes it apparent that Osorio had the defendant's cell phone and was actively using it at the defendant's direction. For example, on June 12, 2025, the defendant had a recorded call with Osorio in which he told her to "go to the phone that you have" to look up the phone number for another person to contact an attorney ("Individual-1"). Later that day, in another recorded phone call, the defendant asked, in

sum and substance, whether Osorio had been able to speak with Individual-1, and Osorio confirmed that she had been able to obtain the telephone number for Individual-1.

As the defendant's incarceration continued, he began to repeatedly violate MDC policy by using other inmates' PAC numbers and possessing a contraband cell phone. MDC policy provides that each inmate has a secret and unique phone access code ("PAC") and must register all recipients of calls on an inmate call list. MDC prohibits the sharing or selling of PAC numbers, using another inmate's PAC number, or calling a recipient who is not on an inmate's approved list. Since his arrest, the defendant consistently used PAC codes held by other MDC inmates to communicate with Osorio in order to avoid law enforcement scrutiny and to continue to engage in obstruction of justice. On these calls, the defendant and Osorio discussed his property that Osorio had taken from the airport, and the defendant instructed Osorio to get a burner phone "on the Jane Doe side." The defendant also used a contraband cell phone to communicate with Osorio; a later search of a cell phone belonging to Osorio pursuant to a judicially authorized search warrant found a screenshot that showed the defendant using a cell phone to have a video call with Osorio while he was incarcerated at the MDC.

On December 15, 2025, a superseding indictment was filed adding one count of concealment of evidence, in violation of 18 U.S.C. § 1519, against the defendant and Kimberly Osorio; one count of obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2), against the defendant and Osorio; and two counts of making false statements, in violation of 18 U.S.C. § 1001, against Osorio, all relating to their efforts to obstruct the investigation. On April 16, 2026, the defendant pleaded guilty to count one of the superseding indictment, charging wire fraud conspiracy, pursuant to a plea agreement.

II.        Applicable Law

The Supreme Court has explained that the Court "should begin all sentencing proceedings by correctly calculating the applicable range of imprisonment under the Guidelines. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). Title 18, United States Code, Section 3553(a) provides, in part, that in imposing sentence, the Court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]

(2) the need for the sentence imposed--

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct; [and]

5

(C) to protect the public from further crimes of the defendant.

Section 3553 also recognizes the need to afford the defendant opportunities for rehabilitation.  See 18 U.S.C. § 3553(a)(2)(D).  Thus, the Court must first calculate the correct Guidelines range and then apply the 3553(a) factors to arrive at an appropriate sentence.  The district court must also "remain cognizant of them throughout the sentencing process."  Gall, 552 U.S. at 50 n.6.

III.       Sentencing Guidelines

        The government has calculated the applicable Guidelines range for the defendant as follows:

| | | |
|---|---|---|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | | 7 |
| Plus: | Loss More Than $250,000 (U.S.S.G. § 2B1.1(b)(1)(G)) | +12 |
| Plus: | Financial Hardship to One or More Victims (U.S.S.G. § 2B1.1(b)(2)(A)(iii)) | +2 |
| Plus: | Misrepresentation Regarding Charitable Organization (U.S.S.G. § 2B1.1(b)(2)(9)(A)) | +2 |
| Plus: | Using a Minor to Commit a Crime (U.S.S.G. § 3B1.4) | +2 |
| Plus: | Obstructing the Administration of Justice (U.S.S.G. § 3C1.1) | +2 |
| Less: | Acceptance of Responsibility (U.S.S.G. § 3E1.1) | −3 |
| Total Adjusted Offense Level: | | 24 |

        The total Adjusted Offense Level is 24, which, with a Criminal History Category of II, carries a Guidelines range of 57 to 71 months' imprisonment.  The defendant stipulated to this Guidelines calculation, except for: (a) the loss amount, which the defendant stipulated was at least $150,000, and (b) the potential application of a minor role adjustment under U.S.S.G. § 3B1.2(b).

        The government's Guidelines calculation differs from Probation's, in that Probation would deny the defendant three points for acceptance of responsibility under U.S.S.G. § 3E1.1 because he is also subject to the enhancement for obstruction of justice under U.S.S.G. § 3C1.1.  As the government indicated in the defendant's plea agreement, if the defendant clearly demonstrated acceptance of responsibility, through allocution and subsequent conduct, and pleaded guilty by April 16, 2026, the two-level reduction under U.S.S.G. § 3E1.1(a) and the additional one-level reduction under U.S.S.G. § 3E1.1(b) would be warranted.  The defendant

clearly accepted responsibility by his plea of guilt, and the government is not currently aware of any conduct by the defendant since his guilty plea that would undermine his acceptance of responsibility.  Therefore, the government intends to move for the defendant to be granted a three-point reduction under U.S.S.G. § 3E1.1.

IV.        Sentencing Recommendation

The government respectfully submits that a custodial sentence of 66 months' imprisonment reflects the seriousness of the defendant's conduct, the need to promote respect for the law, and the need to provide adequate deterrence to the defendant and to others contemplating similar acts.  See 18 U.S.C. § 3553(a)(1), (a)(2)(A), (a)(2)(B).

The seriousness of the defendant's crimes cannot be overstated.  He betrayed the trust of his colleagues, the Organization's low-income clients, and the funders and donors that believed in the Organization's mission.  The defendant's theft of the Organization's funds for vacations to Bali and Santa Monica, expensive dinners, teeth whitening, and handbags could not have been more at odds with the mission of the non-profit he was entrusted to serve.  Having been a criminal defendant himself, the defendant surely knew how important the funds that he stole were in providing crucial services for the Organization's clients.  The Organization's credit cards were meant to be used to pay for a meal for a hungry client or a ride home from night court for the attorney on arraignment duty.  While their colleagues were trying to make the most of their limited resources, Ruhani treated the Organization as his personal slush fund, diverting funds from the most disadvantaged members of his community to fund his luxury lifestyle.

The impact of the defendant's fraud on the Organization was devastating.  As this Court is well aware, non-profits that represent indigent criminal defendants play a vital role in New York City's criminal justice system.  The defendant's greed and selfishness caused the dissolution of the criminal defense practice of one of the largest criminal defense organizations in New York City.  In March 2025, the Organization lost its contract with New York City to provide indigent legal services, and another organization was selected to take over its contract beginning in July 2025.  Because the defendant's fraud caused the Organization to lose the trust of its primary funders, the Organization, which previously represented indigent criminal defendants throughout Queens, had to effectively close its criminal defense practice.  While another legal services organization took over the Organization's criminal defense contract, allowing many of the criminal defense attorneys formerly employed by the Organization to continue representing their clients, not all of the Organization's employees were able to make this transition.  For some of the Organization's staff, the defendant's fraud marked the end of their careers in public service.  And the defendant caused significant damage beyond the Organization's criminal defense practice.  As a result of the defendant's theft, the Organization lost millions of dollars of funding, shut down food pantries that previously fed over 100 families per week, and ended services such as holiday meal giveaways, summer youth employment programs, and programs to educate community members about their rights.  The loss of the Organization's services will likely continue to be felt by the under-resourced communities of Queens well after the defendant has been sentenced.  A significant custodial sentence is necessary to reflect the gravity of the defendant's breach of the Organization's trust and the serious, irreversible harm inflicted by his corruption.

7

Moreover, a custodial sentence is necessary to advance the compelling need for general deterrence of financial crimes. As Courts in this Circuit have recognized, "[t]he need for general deterrence is particularly acute in the context of white-collar crime." United States v. Johnson, No. 16 Cr. 457 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018), vacated on other grounds, Johnson v. United States, 144 F.4th 133 (2d Cir. 2025); accord United States v. Stein, 09 Cr. 377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010); United States v. Marsh, 2011 WL 5325410, at *1 (E.D.N.Y. Oct. 26, 2011) (noting people "choose to engage in white-collar crime because they believe that the potential for significant financial benefits outweighs the risk that they will be punished"); United States v. Emmenegger, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (stressing the need to deter those who "find themselves subject to the temptations of those who handle large sums of money"). Indeed, "[b]ecause economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'" United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (alteration in original) (quoting Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)). A custodial sentence is necessary to deter other defendants like Ruhani who would engage in calculated, deliberate frauds because they think they will not be caught.

The defendant's concealment of his cell phone and further attempts to obstruct law enforcement's investigation also separately calls for significant punishment. Crimes like the defendant's successful disposal of his cell phone undermine the government's ability to arrest and prosecute perpetrators for offenses they have committed. Even after his arrest, his continued violations of MDC policy, advice to Osorio to buy a burner phone, and possession of his own contraband cell phone all showed his determination to thwart the ongoing investigation. His actions were aimed at undermining the administration of justice and warrant a significant period of incarceration.

The defendant's history and characteristics weigh strongly in favor of a significant custodial term. He has five prior felony convictions, including possession of a narcotic drug, two convictions for criminal possession of a weapon, attempted robbery in the first degree (with a deadly weapon), and robbery in the first degree (simulating a firearm). The conduct underlying these convictions was violent and serious: among other things, the defendant stabbed one victim in the stomach, possessed a .38 caliber revolver while a convicted felon, slashed another victim in the face, and robbed a third victim by simulating a firearm. For the latter conviction, the defendant was sentenced to 25 years to life in prison as a mandatory persistent violent felon. Thus, he was on lifetime parole when he committed the charged fraud against the Organization. In addition, while committing the instant offense, he repeatedly lied to his parole officer about his current residence, insisting that he was living with his mother when, in fact, he was living at the Penthouse Apartment. The defendant's persistent pattern of criminal conduct and inability to abide by the conditions of his lifetime parole both weigh strongly in favor of a significant prison term.

Finally, the defendant should be sentenced to a custodial term to avoid unwarranted sentencing disparities with other defendants who similarly steal from the non-profit organizations that employ them. Custodial sentences are the norm for insiders who steal from their own charitable organizations in this district and elsewhere in the region, including many defendants who have nothing like the defendant's criminal record; the defendant should be no exception. See, e.g., United States v. Marcia Joseph, 24 Cr. 4 (ENV) (21 months' incarceration); United States v.

8

Abboud, 16 Cr. 396 (ERK) (E.D.N.Y. Jan. 12, 2023) (33 months); United States v. Shanley, 19 Cr. 383 (SHS) (S.D.N.Y. Jan. 16, 2020) (24 months); United States v. Murray, 23 Cr. 244 (PAE) (S.D.N.Y. Sept. 12, 2023) (18 months) United States v. Insaidoo, 16 Cr. 156 (VEC) (S.D.N.Y., Oct. 4, 2017) (48 months); United States v. Meakem, 21 Cr. 0061 (MPS) (D. Conn. Aug. 3, 2021) (24 months); United States v. Devine, 23 Cr. 136 (SRU) (D. Conn. Feb. 6, 2025) (24 months); United States v. Gileno, 19 Cr. 161 (VAB) (D. Conn. Nov. 13, 2019) (12 months); United States v. Larivee, 19 Cr. 088 (GWC) (D. Vt. May 9, 2022) (8 months) United States v. Van Vught, 23 Cr. 49 (CR) (D. Vt. July 2, 2024) (27 months); United States v. Tucker, 17 Cr. 501 (CCC) (D.N.J. Apr. 18, 2018) (38 months).  A significant custodial sentence would avoid unwarranted sentencing disparities, 18 U.S.C. § 3553(a)(6), and send a clear message that stealing from charities will trigger significant punishment.

## V.      Forfeiture

Pursuant to the terms of the plea agreement, the defendant has agreed to pay forfeiture in the amount of $102,534.27, which represents the proceeds to the defendant from the offense of conviction.  The government respectfully requests that the Court pronounce forfeiture at sentencing as set forth in the forfeiture money judgment previously filed with the Court.  See ECF No. 77.

## VI.     Restitution

Pursuant to the terms of the plea agreement, the defendant has agreed to pay restitution in the full amount of the victim's losses from her conduct and agreed that these losses are no less than $300,000.  The government submits that the defendant and Zeno's fraud was responsible for losses to the Organization in the amounts of: $291,171.50 in credit card expenses, including the value of purchases with credit card points that could otherwise have been converted into cash; $123,342.47 in gross pay to Employee-1, Employee-2, and Employee-3; $21,700, which is the unpaid balance on a loan provided by the Organization to Ruhani at Zeno's behest; $65,152.50 in costs incurred by the Organization to pay for an audit to assist in identifying the full scope of the defendant's embezzlement; and at least $87,946.57 in attorneys' fees incurred as a result of the prosecution; subtracting $9,901.99 in refunds received by the Organization for some of the defendant's purchases.  Thus, the government requests that the Court impose restitution in the amount of $580,221.05, as set forth in the table below.[3]

| | |
|---|---|
| Credit Card Expenses | $291,171.50 |
| No-Show/Low-Show Jobs | $123,342.47 |
| Unpaid Balance on Loan to Ruhani | $21,700.00 |
| Audit to Investigate the Fraud | $65,152.50 |
| Attorneys' Fees | $87,946.57 |

---

[3]     The government understands that the Organization is still in the process of preparing an affidavit of loss and victim impact statement.  Should the government receive an affidavit of loss or any further information about the Organization's losses prior to sentencing, the government will promptly provide this information to the Court.

| Refunds Received by the Organization | ($9,091.99) |
|---|---|
| **TOTAL** | $580,221.05 |

VII.      Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 66 months' incarceration, forfeiture in the amount of $102,534.27, and restitution in the amount of $580,221.05.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:      _____

Russell Noble
Sean M. Sherman
Brooke Theodora
Assistant U.S. Attorneys
(718) 254-6178

cc:      Clerk of the Court (RPK) (by ECF & E-Mail)
Elena Fast, Esq. & Michael Perkins, Esq. (by ECF & E-Mail)
Maxine Marquez, United States Probation Officer (by E-Mail)